Royal Thomas **ARNOLD** et al.,
Plaintiffs,

v.

John S. **BALLARD** et al.,
Defendants.

No. C 73–478.

United States District Court,
N. D. Ohio, E. D.

Jan. 31, 1975.

Joel L. Selig, Joel G. Contreras and A. C. Wharton, Jr., Lawyers' Committee For Civil Rights Under Law, Washington, D. C., and Edwin L. Parms, Akron, Ohio, for plaintiffs.

William R. Baird, Director of Law, Richard Fennelly, Asst. Director of Law, Akron, Ohio, Thomas H. Barnard, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendants.

William Holland, Akron, Ohio, for intervenor-defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LAMBROS, District Judge.

Before presenting formal findings and conclusions, a few generalizations should be made. This type of case, where allegations of discrimination in public employment are made, is troublesome in a number of ways. It forces the United States Government, through its courts, to intervene in local affairs. Such intervention is disruptive no matter how it is conducted. These cases also force the courts to assess and determine the rights of countless individuals who have never had the opportunity to appear and make their arguments on the issues determined. Last, this type of case presents a situation in which the judges may find themselves actively involved in control-

ling the daily operations of a large metropolis.

Nonetheless, the United States Constitution and the laws of this nation require this intervention when allegations of the type presented here are raised. The obligations of a United States District Judge may not be evaded no matter how uncertain the footing on the ground to be covered. In this particular case the exemplary performance by counsel on both sides has eased the task, and the efforts are appreciated.

## I. FINDINGS OF FACT

1. This action was brought pursuant to the Fourteenth Amendment of the United States Constitution and 42 U.S. C. §§ 1981 and 1983 for injunctive and monetary relief from policies that allegedly have the effect of discriminating against blacks employed or who seek employment in the Fire or Police Divisions of the Safety Department of the City of Akron. By Order of the Court on March 25, 1974, the instant proceedings have been limited to issues relating to alleged racial discrimination in the selection of applicants for the Police Division. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1343(3), 1343(4), 2201, and 2202.

2. The named plaintiffs (all individual black males) include Ernest Johnson, Jr., an applicant for the Police Division; Morris Anderson, who applied for the Police Division in 1971 and was denied employment because he failed to obtain a passing score on the written entrance examination; Royal Thomas Arnold, a 1971 applicant for the Police Division who was denied employment because he did not take the written examination; and Dwight Tye, who was denied employment by the Police Division in 1971 because he did not meet the minimum height requirements. By order of this Court on September 4, 1973, Johnson, Anderson, Arnold, and Tye, along with the five other named plaintiffs whose grievances do not relate to Police Division entrance requirements, are representatives of the following class:

all black persons who have been, are, or will be during the course of this suit employees of the Police Department; who have been, are, or will be during the course of this suit applicants for employment in the Fire or Police Department; and who apply or would have applied and completed the processing procedures for employment with the Police or Fire Department but for the defendants' racially discriminatory hiring and employment practices and reputation therefor.

3. The named defendants are John S. Ballard, Mayor and Safety Director, City of Akron; Carl Best, Fire Chief, City of Akron; Harry Whiddon, Chief of Police, City of Akron; Jack W. Moye, President, Akron Civil Service Commission; Robert W. Wheeler, Vice President, Akron Civil Service Commission; and Martha L. Nelson, Member, Akron Civil Service Commission, individually and as officers of the City of Akron and officers and/or members of the Akron Civil Service Commission, and their agents, assigns, and successors in office.

4. Insofar as is pertinent to entrance requirements in the Police Division, the complaint alleges: (a) Defendants had not, as of the date the complaint was filed, made "continuing and substantial efforts" to recruit blacks; (b) Blacks are deterred from applying for the Police Department because of the Police Department's reputation in the black community; (c) The written entrance examinations given in 1971 and preceding years excluded a disproportionate number of blacks and were not job-related; (d) Two other requirements—possession of a high school diploma or General Educational Development certification of high school equivalency (GED), and successful completion of a background investigation (which includes a review of credit ratings and arrest records)— have excluded and are likely to exclude a disproportionate number of blacks and are not job-related; (e) Defendants grant preference to former employees and to friends and relatives of present employees of the Police Department;

(f) Defendants have not taken appropriate affirmative action to correct effects of discriminatory practices; (g) The percentage of black Akron police officers is disproportionately small in relation to the percentage of blacks in the Akron population.

5. The following are population figures from 1970 United States Census of the City of Akron, Ohio:

| AGE | TOTAL | BLACK | WHITE | %BLACK | %WHITE |
|---|---|---|---|---|---|
| 0–65+ | 275,425 | 48,232 | 227,193 | 17.5% | 82.5% |
| 20–65+ | 175,492 | 25,599 | 149,893 | 16.6% | 85.4% |
| 0–19 | 99,933 | 22,633 | 77,300 | 22.6% | 77.4% |

6. Of approximately 493 officers employed by the Akron police as of May 2, 1973, 15, or 3.0%, were black. In addition to these 15 persons, approximately 7 other black officers are known to have been employed by the Akron Police Department to the present.

7. From January 1, 1965, to December 31, 1971, approximately 287 persons were hired by the APD, of whom ten (10), or 3.7%, were black. The yearly breakdown of appointments is as follows:

| | TOTAL NO. APPOINTED | WHITES APPOINTED | BLACKS APPOINTED |
|---|---|---|---|
| 1965 | 1 | 1 | 0 |
| 1966 | 25 | 25 | 0 |
| 1967 | 41 | 40 | 1 |
| 1968 | 53 | 49 | 4 |
| 1969 | 61 | 60 | 1 |
| 1970 | 52 | 51 | 1 |
| 1971 | 54 | 51 | 3 |
| | 287 | 277 | 10 |

8. There have been no Civil Service examinations for the Akron police since 1971. The city intends to hire approximately 60 police officers in 1974; the city conducted an entrance examination for police candidates on June 13–15, 1974.

9. The racial composition of the Akron police workforce by rank, was as follows as of May 9, 1974:

| | TOTAL AUTHORIZED STRENGTH | NUMBER OF BLACKS EMPLOYED |
|---|---|---|
| Chief | 1 | 0 |
| Deputy Chief | 3 | 0 |
| Captain | 8 | 0 |
| Lieutenant | 19 | 0 |
| Sergeant | 65 | 1 |
| Patrolman | 425 | 13 |
| Policewoman | 2 | 0 |
| Secretary of police | 1 | 0 |
| Civilian employees | 25 | 3 |
| | 549 | 17 |

10. Individuals eligible for employment in the Akron Police must be between the ages of 21 to 30 years, meet the Division's height, weight and vision requirements, possess a high school diploma or General Educational Development certification of high school equivalency (GED), and have resided within the corporate limits of the City of Akron for one year. The residency requirement was waived for the Akron Police Department from August, 1966 through 1970 pursuant to the provisions of the Akron City Charter, Section 106(5b).

11. An applicant meeting these minimum qualifications is permitted to take a written examination administered by the Akron Civil Service Commission. In order to pass the examination and be ranked on an "eligible list", an applicant must attain a general average of 70% (out of a possible 100%) on the examination. For ranking purposes, 70% of an applicant's final rank is based on his score on the written examination, and the remaining 30% is based on an evaluation of his education and experience.

12. A physical examination is given to all applicants who successfully complete the written examination. After the physical examination and prior to appointment, the applicant is subjected to an investigation of his general background, character, and general fitness. This investigation includes, among other things, the applicant's credit rating, police record, residency and high school record.

13. The names of those applicants found to be qualified are placed on an eligible list in order of their final score, as outlined above. Names from the eligible list are presented in rank order to the Chief of the Akron Police Department when he has made a requisition for new employees.

14. The Police Chief then selects from the eligible list the individuals to fill the vacancies. In doing so, the Chief is vested with discretion granted by the Akron City Charter Section 106.(6) (rule of three). Under that Section and the Rules of the Akron Civil Service Commission, for every vacancy to be filled, the Chief is presented with three names from the eligible list, and may select any one of the three.

15. There is no evidence before the Court which indicated that the veterans preference, the height/weight requirements, the vision tests, the residency requirements or the age requirements have disqualified a disproportionate number of blacks.

16. As to the other requirements for entrance to the Akron Police Department, the Court finds as follows:

### High School Education

A. According to the 1970 United States Census, 52% of the white population has 12 or more years of education, while only 34% of the black population is similarly qualified.

B. Until May 10, 1965, the requirements for employment in the Akron Police Department included a high school diploma.

C. Since 1967, a General Educational Development certificate has been accepted as a substitute.

D. The high school diploma/GED requirement bears a substantial relationship to the job of Akron police officers. This was established by the testimony of Dr. Gerald V. Barrett, an industrial psychologist and qualified expert on employee selection procedures. More particularly, the Court concurs in the conclusions of Dr. Barrett's study of the Akron Police Department (Development of a Selection Program for Patrol Officers, Def. Ex. 85A, pp. 23–25). These conclusions are based on: (1) An analysis of word samples from the Police Department's training bulletins, which revealed that the required reading level of police trainees is, and at all relevant times has been, above a twelfth-grade level. (2) A job analysis study of duties of Akron police officers, which revealed: that ten to fifteen percent of an officer's daily time is spent in preparation of comprehensive, detailed written reports;

that patrol officers must prepare detailed written and verbal materials for use as the basis of court testimony; and that a patrol officer's job entails extensive interaction and communication with diverse members of the community. (3) Reports by independent commissions, established by both state and federal governments, which uniformly recommend that at least a high school education be required of police force applicants [Standards and Goals Comparison Project, Final Report, Volume II, Police, Ohio Department of Economic and Community Development, Administration of Justice Division, Ohio State University, 1974; Police Task Force Report, National Advisory Commission on Criminal Justice Standards and Goals, 1973; The Challenge of Crime in a Free Society, The President's Commission on Law Enforcement and Administration of Justice, 1967; and Task Force Report: The Police, The President's Commission on Law Enforcement and Administration of Justice, 1967]. (4) A 1972 validation study (conducted by Cohen and Chaiken) of education requirements in the New York City Police Department, which established a significant correlation between higher educational attainment and improved police performance. (5) The desirability of continuing education and training for police officers (such as courses appraising the patrol officer of recent court decisions and new investigative and forensic procedures), most of which build upon knowledge normally acquired in high school.

■ E. Based on these findings, the Court determines that the high school education requirement is substantially job-related and is a valid requisite for employment as a policeman even if a higher proportion of blacks are disqualified because of it.

*Background Investigation*

A. Applicants who successfully complete the written examination for the Akron police are subject to an investigation of their general background, charac-

ter, and general fitness (hereinafter "background investigation").

B. The background investigation includes the applicant's credit rating and record, police record, residency, high school record, schools attended, neighborhood references, and former employers.

C. The Chief of the Akron Police Department supervises the background investigation of applicants.

D. There are no written standards which set forth guidelines or regulations for disqualifying a person on the basis of his background investigation.

E. Although the Personnel Director of the City of Akron (defendant Buian) is responsible for policy decisions with respect to background investigations, he testified that he does not know what policies are being followed by the Police in this area.

F. The background investigation results are not supplied to or reviewed by the Personnel Department, except in the event that the Police Department formally requests the Personnel Director to remove an individual from the eligible list on the basis of the background investigation. Such formal requests are unusual because of the policy of inducing applicants to withdraw voluntarily when adverse information is developed by the investigation. Even when a formal request for disqualification is made, the actual investigative report is not supplied to the Personnel Department; rather, the Personnel Department is advised by the APD of the reasons for the proposed disqualification.

G. Although the Akron police officials have consulted with the Personnel Department with respect to background investigations, the Police Chief testified that the Police make most of the determinations on such matters, and that he could not recall any determinations with respect to background investigations which were made outside of the Department.

H. Policy decisions on questions arising from the background investigation are made on a case-by-case basis.

I. The Police Chief testified on direct examination that all elements are evaluated as a totality in the background investigation, that no negative factor is automatically disqualifying, and that all doubts are resolved in favor of the applicant. He testified that neighborhood checks are used advisedly, with every advantage being given to the applicant; that juvenile records are looked at in a broad manner, and that every advantage is given to the applicant provided his adult record is satisfactory; that arrests and convictions are examined with a view to the circumstances which caused them to occur and other surrounding circumstances; and that misdemeanor convictions some years previous to the application would not be disqualifying.

J. The Police Chief testified that felony convictions are automatically disqualifying. He testified that an adult conviction for a petty larceny misdemeanor would be automatically disqualifying; that conviction for any theft— petty or grand— would result in the applicant's being called on to withdraw his application and that an arrest without a conviction could be considered as adverse to the applicant, depending on the circumstances regarding the lack of a conviction.

K. The Akron Police Department has followed a policy of requesting applicants whose background investigations reveal factors which the investigator considers disqualifying to withdraw their applications. If the applicant withdraws his application, this avoids the necessity of a request to the Personnel Department for a formal disqualification of the applicant.

L. Because of the small number of black applicants who have not been eliminated from consideration prior to the background investigation stage of the application process, the absence of racially identified data for years prior to 1968, and the absence of quantified data on the effect of the background investigation on white applicants, there is insufficient evidence for the Court to determine whether a greater percentage of black applicants than of white applicants have been eliminated as a result of the background investigation. However, the evidence does establish that the background investigation was responsible for the elimination of two otherwise qualified black applicants in years when a total of 85 whites and one black were appointed, and in the case of one of these applicants, sufficient evidence was presented to raise questions concerning the Akron Police Department's action in inducing him to withdraw his application.

M. On the basis of paragraphs above, the Court finds that the background investigations which defendants conduct on applicants are susceptible of arbitrary or discriminatory application; that there are no written standards setting forth guidelines or regulations for disqualifying an applicant on the basis of these investigations; that the Police Department follows a policy of persuading applicants to withdraw their applications when it feels that adverse factors have been developed by the background investigation; and that such a practice of inducing voluntary withdrawals is susceptible of arbitrary or discriminatory application and is not subject to review by any agency outside the Akron Police Department.

N. For these reasons, the Court finds that changes in the background investigation procedure are necessary to insure that it is not employed in an arbitrary and discriminatory fashion to the detriment of black applicants.

*Written Examinations Utilized Prior To 1974*

A. Prior to May 10, 1965, the written examinations for the Akron Police Department were developed in the Personnel Department of the City of Akron. These written examinations were eliminated in late 1965 because of a determination that the tests contained many items unrelated to police employment.

B. Defendant Buian testified that he eliminated these tests when he became Personnel Director of the City of Akron

because he had heard that the tests were not related to the jobs for which they served as screening criteria.

C. Only 12 black police officers are known to have been appointed to the Police Department during the period from 1922 to 1965 when these examinations were utilized.

D. From December, 1965 to 1971, the written competitive examinations for employment with the APD were the Public Personnel Association (PPA) Policeman Tests.

E. The last PPA examination administered to applicants for the Police Department prior to the filing of the complaint in this case occurred in August, 1971. Thirty-five City resident blacks took that examination, of whom 30, or 85.7% failed to achieve a passing score. Of 196 white applicants, more than 50% passed.

F. In September, 1970, 35 black persons took the PPA examination for the Police Department of whom 33, or 94.3%, failed to achieve a passing score. Of 257 white applicants, more than 50% passed.

G. When the statistics set forth above are combined, the following represent the results of the September, 1970, and August, 1971, PPA examinations for police applicants: 70 blacks took the examinations, of whom 63, or 90.0%, failed to achieve a passing score; while 453 whites took the examinations, of whom 240 or 53% achieved a passing score.

H. Plaintiffs' expert testified without contradiction that there seemed a definite and rather considerable racial impact from the PPA test.

I. The Court finds that the PPA examination has had a substantial adverse racial impact on black police applicants as compared to white police applicants in Akron, and that this examination has been a primary reason for the small number of black police officers appointed to the APD during the period when it was utilized.

J. The PPA examination was held to be racially discriminatory and not job-related in Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm'n, 354 F.Supp. 778 (D.Conn.1973), aff'd in relevant part, 482 F.2d 1333 (2d Cir. 1973).

K. Prior to trial, the defendants stipulated that: "The City has not validated the PPA police examination pursuant to the EEOC Guidelines on Employee Selection Procedures, 29 C.F.R. 1607.1, et seq., nor has it shown pursuant to prior studies conducted by the City of Akron that the PPA examination as constructed and used had a statistically significant relationship to job performance. The City is presently conducting a study of the prior job performance evaluation methods."

L. The first portion of the evidence presented by defendants' expert showed a statistically significant correlation between the PPA test scores and the grades of the examinees in the Police Academy; but showed no significant correlation between the PPA test scores and the examinee's overall proficiency as patrolman when the entire sample was looked at as a whole.

M. Plaintiff's expert evaluated the evidence presented by defendants and observed that the relationship between PPA scores and Academy scores was logical, since the PPA tested learning ability. He noted no indication that the Police Academy scores included assessment of a person's actual performance later as a police officer.

N. The second portion of the evidence presented by defendants' expert (and based on the same sample) concerned the relationship between the examinees' Police Academy scores and their overall proficiency as patrolmen. This evidence showed no statistically significant correlation between academy rank and overall proficiency when the entire sample was looked at as a whole, however.

O. On the basis of all the evidence presented by defendants' expert, plain-

tiffs' expert concluded that the PPA test had not been shown to have any validity as a predictor of job performance; and that while it had been shown to have some validity as a predictor of police academy scores, the academy scores have not been shown to be related to job performance.

P. The City of Akron has indicated that it does not intend to use the PPA examination in the future.

■ Q. The Court finds that the PPA examination has had a substantial adverse racial impact on black police applicants in Akron; that it is stipulated that prior to the trial herein the defendants had not validated the PPA exam pursuant to the EEOC *Guidelines*, or shown pursuant to any procedure that it has a statistically significant relationship to job performance; that defendants did not contend at trial that they had validated the PPA exam pursuant to the EEOC *Guidelines*; that the PPA exam has been found by other courts to be racially discriminatory and not job-related; and that the evidence presented by defendants' expert at trial in support of the PPA exam does not, for the reasons stated above, demonstrate that it is a valid predictor of successful job performance in the APD, or otherwise justify the City's use of the examination.

*Evaluation of New Examination*

A. For purposes of selecting new police officers in 1974, the City of Akron has developed a new written examination, which was administered to police force applicants on June 13–15, 1974.

B. The examination was developed during the course of an exhaustive validation study specifically commissioned and conducted for the sole purpose of developing a non-discriminatory, job-related test for the selection of police applicants by the City of Akron. The study appears to be based on the EEOC Guidelines for Employee Selection Procedures, 29 CFR § 1602 et seq., and the first draft of new, more stringent EEOC Guidelines. The plaintiffs' expert witness, Dr. Richard Barrett (who has testified in approximately 40 test discrimination suits, approximately half of which involved validation studies) compared the Akron study favorably to others that he had seen.

C. Preparation of the examination began with a detailed job analysis of the duties performed by Akron police officers on basic patrol, the duties to which new officers are assigned. The analysis included: collection of data from questionnaires, interviews with Akron officers, field observation of Akron patrol officers, and a review of Akron police training materials; classification and organization of information, and its assembly into a detailed job description; and, review and revision of the job description. It was concluded that the job of Akron police officers is complex and multi-dimensional.

D. The second step in preparation of the examination involved a detailed review of all relevant literature, including available studies conducted in other police departments and studies relating to cultural bias in testing.

E. The third step in test preparation consisted of development of candidate performance evaluation dimensions and establishment of performance appraisal scales relating to each critical dimension and covering all aspects of police officer job descriptions. The dimensions and scales were developed based on research conducted by Dr. Frank Landy, Department of Psychology, Pennsylvania State University and Dr. Robert W. Heckman, Vice-President, Personnel Decisions, Inc., Minneapolis, Minnesota. The Landy and Heckman projects were recently initiated for the purpose of developing such dimensions and scales for use in evaluation of police officers, and they represent the most advanced evaluation system developed to date. The Landy-Heckman scales were then adapted to the specific local characteristics of the Akron police force by a process which included relating items in the scales to job description categories developed during the job analysis and

adding items to the scales to relate to job description categories not adequately covered by Landy-Heckman items. The scales were then reviewed by Akron police personnel, revised, and organized into a performance evaluation form. The plaintiff's expert witness agreed that this portion of the study was well done.

F. The fourth step in test development was the actual evaluation of current Akron patrol officers by their supervisors in two ways—an overall ranking of men assigned to each supervisor, and a rating of each man in terms of the performance evaluation scale consisting of critical dimensions. The officers' ratings of each specific behavioral dimension were correlated to their overall performance ratings, and a positive correlation significant at the .005 level of confidence was found. The reliability of overall ratings was verified in a second way by a second set of ratings conducted two months later. An item analysis was conducted of items on the performance evaluation scale and the scale was revised accordingly during the process. The results of the evaluation criteria were sufficiently reliable to use as the basis for a concurrent validation study of a potential test battery. The evaluation of patrol officers also revealed no significant difference between the ratings of black and white officers.

G. Finally, a concurrent validation study, a professionally accepted and desirable method of test validation was performed. Tests were selected in light of information revealed by the literature review, which showed: that the tests had been prepared by reputable test specialists: that the tests did not appear to be culturally biased; and that the reliability and validity of the tests had been established by substantial normative data.

H. The tests were then administered to samples of 80 and 106 officers selected at random from the group of officers with less than twenty years' experience who were assigned to the Uniform Section. There was no significant difference between the performance evaluation ratings of black officers selected for the sample and white officers in the sample. Tests were then administered, scored and weighted according to accepted professional standards and tests taken by blacks were scored in exactly the same manner as those taken by whites.

I. The concurrent validation study performed by Dr. Gerald Barrett and his staff established that the four-test battery administered to police applicants on June 13–15, 1974 has practical significance for the selection of Akron police officers and is substantially job related.

J. The test battery is substantially job related because positive correlations were established between test scores of police officers who took the examination during the concurrent validation study and the ratings of these officers on nine of twelve performance criteria dimensions (dependability, job knowledge, domestics, crime prevention, judgment, demeanor, report writing, equipment, investigation, commitment, integrity, initiative) and two of three overall criteria measure (composite criteria and overall performance ranking).

K. On June 13–15, 1974, the examination was administered to a group of police force applicants which included 159 blacks. The scores of blacks and whites on the examination were compared by a statistical technique known as a Chi Square analysis, and it revealed no statistically significant difference in distribution of scores and no significant difference in means of blacks and whites.

L. Any difference between the performance of blacks and whites in June, 1974 written examination may well reflect a difference in their probability of success in the job. As part of the validation study, Dr. Gerald Barrett conducted an extensive review of suitable literature which relates to this conclusion. The most recent studies indicate that where tests on their face are

not culturally biased, reports that tests validly predict job performance for caucasians but not for blacks are equally as attributable to inadequate sample size, failure to consider restriction of range, or poor criteria measures, as to flaws in the test instrument itself.

M. Accordingly, when as here tests have been selected with care to avoid cultural bias the possibility that a difference between black and white test scores would not reflect a comparable difference between their probability of success on the job is extremely remote.

N. The results of the 1974 selection process up to and including the examination stage show that the blacks comprise a larger percentage (22%) of those eligible for consideration at the final stage of the selection process than they comprise of either the Akron population (17.5%) or the Akron population age 20–65; (14.6%). Accordingly, the selection process has not yet demonstrated an adverse disparate impact on blacks.

O. Therefore, the Court finds that the new examination has not yet demonstrated a disproportionate impact on black applicant and is job-related.

*Minority Recruitment Efforts*

A. In 1965 and 1966, 26 officers, all of whom were white, were appointed to the Akron Police Department.

B. In 1967 the City first engaged in special recruitment programs designed to attract minority candidates for the Akron Police. At a meeting to discuss insufficient black employment with approximately 10 black community leaders, the Mayor requested about 30 black clergymen in Akron to recommend at least one applicant. Police Chief Whiddon agreed to send police officers to community meetings called by the President of the Baptist Ministerial Conference and the President of the Ministerial Alliance. The Police Chief publicly assured the President of the Akron Branch of the NAACP, Mr. Edwin Parms, that black officers would be equally treated with white officers. A special recruiting brochure, black-oriented, was distributed in the black community of Akron. News stories were published in the Akron Beacon Journal indicating the desire of the City of Akron to hire black persons in the Police Department.

C. In 1968, a recruiting drive was implemented by the City's Personnel Department to recruit black applicants for the Police Division. Meetings were held with various black community organizations and churches. Designated police officers and recruiters from the Personnel Department requested time on the agenda of some black organizations to discuss the advantages of a career with the Police Department. These groups were also asked to submit the names and addresses of potential black applicants. Returning Viet Nam veterans, including blacks, were considered to be prime prospects and an attempt was made to contact as many of them as possible.

D. The Mayor of Akron received a letter from the Akron NAACP, dated September 16, 1969, requesting immediate steps to improve black employment in the City of Akron, specifically black policemen and firemen.

E. In 1969, the City relied upon efforts to recruit minority persons for the Police Department in a manner similar to the efforts conducted in 1967 and 1968.

F. In 1969 the City made the first attempt to establish pre-test training for applicants. The proposed pre-test training course would have also been available for black applicants. It was not implemented. The City requested the Ohio Bureau of Employment Services (OBES) to establish the program. The request was denied because OBES said no funds could be spent on a training program for under-employed persons, only unemployed persons.

G. A plan was proposed by the Personnel Director of the City of Akron and adopted by the Akron Civil Service

Commission on December 4, 1969, to create an Equal Opportunity Officer position, training officers, and clerical support. This plan was not implemented due to a lack of enacting ordinances by the Akron City Council.

H. In 1970, a recruitment program, which the City assisted in formulating, was undertaken by the Akron Branch of the NAACP, the Urban League, the Akron Ministerial Alliance, and the Akron Chapter of Frontiers International. The Urban League agreed to donate $3,500.00 to "Project Overcome", and the Mayor requested and received a grant of $3,500.00 from Akron Community Trusts (ACT) to "Project Overcome", which provided the total cash cost of $7,000.00. The $3,500.00 donated by ACT was used to hire two (2) part-time recruiters, one of whom was a retired black police officer. The Urban League portion was used to pay the cost of instructors for a pre-test training program. Project Overcome contacted 75 potential black applicants; 34 applied; 7 were ineligible to take the examination; 8 applicants did not appear for the examination; 19 applicants were examined; and only one (1) passed the PPA examination.

I. The City's Personnel Department on February 10, 1971 undertook a recruitment program, Police and Fire Careers Program, consisting of personal contacts with potential candidates. A black employee in the Personnel Department was assigned as a recruiter to identify potential minority candidates and then maintain contact with them to encourage their participation in the written examination, among other assigned duties. All black applicants were encouraged to take the Otis-Lennon mental ability test in order to identify educational deficiencies. They were then encouraged to attend pre-test training courses at the Urban League designed to provide remedial education to assist them in taking the required examinations. Three blacks completed the pre-test training course and two

attended on a part-time basis. A total of 98 black candidates were individually recruited; 30 did not participate in the written examination; 35 took the PPA exam; and 5 passed.

J. The City of Akron Personnel Department formulated a Selection Evaluation Program in 1972 to review the entire employment procedure of the City of Akron to insure equal employment in the selection procedures of the City of Akron. This program was adopted by the City of Akron, but was not funded.

■ K. The Court finds that it is undisputed that no special minority recruitment efforts were engaged in by the defendants prior to 1967; and that from 1967 through 1971, when the defendants did engage in minority recruitment efforts, the results of the defendants' recruitment and appointment procedure was that 10 blacks and 251 whites were appointed to the Akron Police Department. Thus, during the period when the defendants engaged in minority recruitment efforts, 3.8% of the officers appointed were black; according to the 1970 Census, the population of the City of Akron is 17.5% black. The Court finds that the minority recruitment efforts in which the defendants engaged from 1967 to 1971 were insufficient to overcome the past and ongoing pattern of discrimination against black APD applicants in which the defendants had and were engaged.

L. The complaint in this case was filed on May 11, 1973. On October 16, 1973, the City of Akron received a grant from the Summit County Criminal Justice Commission (S.C.C.J.C.) to fund a minority recruiting campaign.

M. In preparation for the June 1974 examinations, the APD assigned one young black police officer to work full-time on this project for six months. He worked out of an office in the Personnel Department, under the supervision of the Commander of the Police Community Relations Unit of the Police

Department. This Commander, who is white, was directed to spend a majority of his time on this project with authority to assign any of the other black officers to the project on an as-needed basis.

N. The S.C.C.J.C. grant, "Attitude Modification of Potential Police Department Recruits", provided funds to purchase billboards, radio time, newspaper advertising space, special black-oriented brochures, posters, and special telephones which potential recruits might call for additional information.

O. Six of the thirteen present black officers made radio spot advertisements urging eligible young black men and women who might be interested to call and obtain more information. The purpose of the campaign was to recruit and sustain interest of black candidates for employment with the APD in 1974.

P. The S.C.C.J.C. grant funds are used to cover the costs of the media aspects of the overall minority recruiting campaign. All other costs are born by the City. The amount of the grant is $27,000.00. In addition, the S.C.C.J.C. funded the Manpower Development and Training Skill Center, sponsored by the Akron Board of Education and the United States Department of Labor, to provide preapplication testing and remedial education courses to those applicants who show deficiencies in certain areas. This program was open to white applicants as well as black applicants.

Q. The Court finds that the result of the minority recruitment efforts which the defendants undertook subsequent to the filing of the complaint in this case (and subsequent to the entry of the Court's one-for-one hiring order in the Fire Division portion of this case) was that 29% of the June 13–15, 1974 examinees were black, as compared to 10% of the examinees during the period from 1968 through 1971 and that 159 of the June 1974 examinees were black, as compared to 101 of the examinees during the period from 1968 through 1971.

R. The Court finds that substantial good faith recruitment efforts have been made by defendants, albeit success has been limited.

*Reputation in the Black Community*

A. The Executive Director of the Akron City Service Center and Urban League, who has participated in past efforts to recruit black applicants for the APD, testified that the APD has had a reputation in the black community to the effect that blacks were not wanted in the APD, and to the effect that there was no upward mobility for black APD officers.

B. Two black APD officers assigned to the Community Relations Bureau in the recruiting effort for the June 1974 examinations testified that the reputation of the APD in the black community and the limited number of black officers in supervisory ranks have been adverse factors in their efforts over the past several years to recruit black applicants for the APD.

C. There is presently one black officer in a supervisory position in the APD, and there has been one other black officer in a supervisory position in the APD during the period from 1922 to the present. No black officer has ever achieved a rank higher than sergeant.

D. The first occasion on which a black and white APD officer were assigned to work together as steady partners was in 1966.

E. The Court finds that the APD has had a reputation in the black community of Akron of not wanting black police officers and of discriminating against its black police officers; and that this reputation has adversely affected recruitment of black APD applicants.

## II. CONCLUSIONS OF LAW

A. *Equitable Relief*

Jurisdiction in this Court is properly based on 42 U.S.C. §§ 1981 and 1983 and the Fourteenth Amendment to the United States Constitution, under 28

**736**

U.S.C. §§ 1343(3), 1343(4), 2201 and 2202.

■■■ The clear import of the statistics dealing with the Akron Police Department is that there has been a disproportionate discriminatory effect against blacks arising in the selection process. The greatest percentage of black officers in the Akron Police Department was 3% and as of May 9, 1974, there were 549 members of the department, of whom 17 were black, and thus a *prima facie* case of unlawful discrimination has been made out. Therefore the burden of rebutting this proof shifts to the defendants. United States v. Masonry Contractors Assn. of Memphis, Inc., 497 F.2d 871 (6th Cir. 1974); Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973). The Court concludes that the statistical evidence of discrimination has not been rebutted by defendants as to the period from 1922 to 1965. During the period from 1965 to 1973, there have been some efforts made to reverse this situation but the use of improper written examinations had an unlawful discriminatory result which precluded meaningful success in this area. It is this past history of discrimination which must be corrected, even though there may have been no intentional deprivation of plaintiffs' constitutional rights. In designing the remedy to be implemented the Court has been aided by these considerations:

> In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionallly, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. Brown v. Board of Education, 349 U.S. 294, at 300, 75 S.Ct. 753, at 756, 99 L.Ed. 1083 (1955).

The use of quotas when imposed for limited periods of time to correct past discrimination has been approved by the Courts of Appeals in eight Circuits, including our own. *Masonry Contractors,* *supra;* United States v. Local Union No. 212, 472 F.2d 634 (6th Cir. 1973); Rios v. Enterprise Assn. of Steamfitters Local 638, 501 F.2d 622 (2nd Cir. 1974); N.A.A.C.P. v. Allen, 493 F.2d 614 (5th Cir. 1974); Morrow v. Crisler, 491 F.2d 1053 (5th Cir. 1974).

The Court would be inclined to allow the present efforts to continue without requiring affirmative action if the immediate future appeared to provide an opportunity for a significant change in present conditions. However, from 1965 to 1971, 270 new positions were created and filled in the Police Department. The likelihood of a similar increase in personnel authorizations has not been shown. While 60 persons will be hired in the near future if the City's present plans are consummated, even if only black applicants were selected for all these positions, the representation in the Police Department would not equal the percentage of blacks in the City of Akron.

The importance of having black officers visible in the community is not to be underestimated, particularly in terms of recruiting efforts. *See* N.A.A.C.P. v. Allen, *supra.*

■■■ Therefore, a requirement that one black applicant be selected out of every three policemen hired seems a reasonable approach. Such relief will be required for a three year period, at which time a reevaluation of the need for this relief will be made. See *Morrow, supra.* In no event, however, will it be continued beyond the point at which black representation in the department equals the representation in the community, in this case 17.5%.

While in all likelihood this will result in some white applicants not receiving their appointments, or in being delayed, these persons have not yet been accepted by the Police Department. They have no particular expectation of employment, at this stage. The need to remedy past injuries to the black community takes precedence over the hopes of these persons.

## B. *Entrance Requirements*

In assessing the written examinations and the other requirements imposed on applicants for the Akron Police Department, the complex and multifaceted role of police officers serving in major metropolitan areas has been demonstrated. The tasks which are to be performed by these persons require the ability to perceive the situation being confronted and act immediately in a proper manner. The officers are in constant contact with the public and our immediate safety, for bad or good, is largely in their hands. There must be some criteria used to select those persons who will serve as police officers.

However, public employers have a high duty to insure that the criteria used to select those persons are racially neutral. To allow all persons the full and complete opportunity to serve and represent their community must be the goal.

A line must be drawn. But in its drawing, care must be taken. Whether the conduct be purposeful or unintentional is of no moment to the person who is denied employment on the basis of improper standards.

The cases dealing with this area of the law have sought to serve both these ends. Thus, even if a test or requirement is shown to have a disproportionately discriminatory effect, if the test or requirement is shown to be job-related it will be approved.

The written examination is the most difficult factor. The subtle discrimination which can unintentionally exist in such an examination is hard to ascertain and difficult to eliminate. In evaluating a new examination, the validation guidelines of the E.E.O.C. (29 C.F.R. 1607, et seq.) are most helpful but the fact that the proposed examination has not been validated in accordance with these factors is not controlling. 29 C.F.R. 1607.1, Statement of Purpose; Green v. Missouri Pacific Railroad Co., 381 F.Supp. 992 (E.D.Mo.1974). The efforts of defendants in validating the new examination meet those considerations found relevant by the First Circuit Court of Appeals in Boston Chapter, N.A.A.C.P., Inc. v. Beecher et al., 504 F.2d 1017 (1974):

> But what is at issue is whether it demonstrably selects people who will perform better the required on-the-job behaviors after they have been hired and trained. The crucial fit is not between test and job lexicon, but between the test and job performance.

> In fairness to the state, we must not forget that civil service tests were instituted to replace the evils of a subjective hiring process. Little will be gained by minorities if courts so discourage the use of tests that the doors to political selection are reopened. Moreover, a test, even one the cutoff of which does not demonstrably predict job performance, may serve worthwhile goals in gross by sifting from the pool of potential applicants those without enough motivation even to try to acquire the skills the test demands, and by discarding some few candidates who take the test but whose mental ability is so low that they are obviously unsuitable. Finally, it is virtually impossible for an employer to justify to a mathematical certainty every selection device. Controlled experiments in which applicants are hired without regard to their test scores may be impractical in many cases, and so those who fail the test often are not available to be evaluated on the job. If they are not, it is impossible to prove that they would have performed less competently. *Beecher*, at 1021–22

In the instant case, the Court is satisfied that the defendants' validation study was adequate. The study does demonstrate job-relatedness. Moreover, in light of the near-equality of performance of black and white applicants, approval of the new examination is warranted. Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commn et al., 482 F.2d 1333 (2nd Cir. 1973); Smith v. East Cleveland, 363 F.Supp. 1131 (N.D.Ohio 1973).

As to the other requirements, the high school education requirement is job-related. It is somewhat arbitrary in nature but a high school degree does indicate a measure of accomplishment and ability which is essential for initial training and performance as a police officer. Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972). Similarly, the height and weight requirements have not been demonstrated to have a racial impact. Unlike the situation in *Smith, supra,* where similar requirements were used to facilitate a discriminatory attitude against women, no similar racial policy or attitude has been demonstrated herein.

See also *Castro, supra.* The vision and residency requirements imposed by defendants have not been challenged in this action, and there being no evidence of any discriminatory effect arising from their imposition, these standards are approved.

### C. *Recruiting*

The recruiting efforts of the defendants undertaken in the past two years have been most effective, as the large number of applicants for the June 1974 examination indicates. The Court is mindful that funding difficulties may arise in continuing these programs. However, such efforts must be continued in the same, or at least similar form. The Court is satisfied that the defendants have acted in good faith and it is therefore determined that no specific requirements in this area need be imposed. Should it appear that there is a substantial change in this area, further consideration will be given to the matter.

### D. *Records and Reports*

To allow the plaintiffs and the Court to monitor and evaluate the efforts made to comply with the decision herein, there will need to be a record-keeping system developed and reporting parameters be established. These will be detailed more fully in the accompanying decree.

### E. *Class Relief*

The previous applicants for the Akron Police Department are members of the class certified in this action. They are the persons most directly affected by the past discriminatory situation and it is only proper that they be accorded preferential treatment *vis-a-vis* the other black applicants. Accordingly, the decree provides for certain limited preferential treatment.

It is so ordered.

## ORDER

LAMBROS, District Judge.

Upon review of all exhibits and testimony submitted herein, and upon consideration of the argument of counsel, the Court orders, adjudges and decrees as follows:

1. The defendants and their agents are permanently enjoined from engaging in any practice or act which has the purpose or effect of discriminating against black applicants for employment in the Akron Police Department on the basis of their race.

2. The defendants may continue to require that all applicants for employment in the Akron Police Department comply with existing height and weight requirements; that all applicants meet existing vision limitations; that all applicants satisfy existing residency requirements; that all applicants be within existing age requirements; and that all applicants be high school graduates or possess a certificate of General Educational Development (G.E.D.). By "existing requirements" in the above statement, the Court refers to those requirements imposed on those persons who took the June 1974 examination.

3. There shall be no use of Background Investigations to disqualify future applicants unless and until the defendants develop written criteria for the performance of those Investigations. Those criteria shall set forth, among other things, the areas of a person's background that will be evaluated, which

factors will be automatically disqualifying and which factors will be considered detrimental. Before implementing any new criteria and procedures, the defendants shall submit the proposals to plaintiffs' counsel and to the Court. This requirement shall be prospective only.

4. Defendants may rank applicants on the basis of performance on the examination given in June 1974 and may continue to utilize that examination for the purposes of screening applicants for the Akron Police Department.

5. Although there is no indication that present Akron officials have intentionally discriminated against blacks, in order that past discrimination be effectively remedied it is ordered that at least one of every three persons appointed to the Akron Police Department shall be black. This requirement will be imposed for the next three years, at which time a review will be made to see whether or not the affirmative relief should continue. If the level of black membership in the Police Department rises to 17.5% of the Police Department within the three year period and remains at that level for one year, then the affirmative relief shall automatically be terminated.

6. To accomplish this goal, the defendants shall rank the black and white applicants on the basis of the criteria approved and in the manner set forth herein. Any black applicant not completing the six-month probationary period shall not count toward fulfillment of the above requirements. If the list of qualified black applicants is exhausted, the defendants shall indicate this situation to the Court and an evaluation of the situation will then be made to determine the appropriate course of action.

7. Black applicants who have applied to the Police Department in the past will be given preferential placement on the eligibility list. All past black applicants who can be identified shall be notified of the provisions of the decree and given an opportunity to take the June 1974 examination if they have not already done so. Those who qualify on the basis of scores on the written examination and the other criteria approved herein shall be ranked above the other successful black applicants. The ranking of those to be preferentially treated shall be based on the date of original examination. Only the first 20 seeking this special relief and qualifying for it are to be treated preferentially. Application for the benefits available in this particular section must be made within 10 days of receipt of notification of the availability of this relief.

8. Defendants shall continue their minority recruiting efforts. The recruiting efforts of defendants in the recent past have been good and there is no basis at this time for requiring any particular type of recruiting. Continuation of the same or similar programs will be entirely adequate.

9. Defendants shall maintain appropriate race-identified records sufficient to enable them to operate in accordance with this decree. Defendants shall retain all such records for a period of at least five (5) years from date of occurrence. Upon receipt of reasonable notice, defendants shall make available for inspection and/or copying by plaintiffs or their designee any or all such records.

10. Within three (3) months after the entry of this decree, and every six (6) months thereafter, defendants shall furnish to counsel for plaintiffs and to the Court a report documenting compliance with the requirements of this decree. This report shall include a list of the then current Police Division personnel showing each employee's name, race, date of appointment, rank, date of rank, subdivision, unit or bureau, and place of assignment. It shall also indicate, by race the number of persons employed at the beginning of the reporting period, the number of persons promoted or terminated, the number entering by appointment or promotion, the number employed at the end of the period, and the number of applicants for employment during the period.

11. The Court retains jurisdiction of this case for such further relief as may be necessary or appropriate.

In conclusion, while complete findings of fact and conclusions of law will be issued, the following statement is felt to be appropriate:

It has been said that most of the world's injustices are inflicted not with fists but with elbows. When we use our fists, we use them for a definite purpose. . . . Our elbows, we may comfortably suppose, trace a random pattern for which we are not responsible. . . . A strong committment to those principles of legality compels a ruler to answer to himself, not only for his fists, but for his elbows as well. (Lon L. Fuller, in The Morality of the Law; Yale University Press, 1964.)

It is so ordered.