Brenda DAVIS, Plaintiff-Appellant,

v.

**CITY OF DALLAS, et al.,
Defendants-Appellees.**

**Cynthia Jayne DURBIN,
Plaintiff-Appellant,**

v.

**CITY OF DALLAS, et al.,
Defendants-Appellees.**

No. 84–1814.

United States Court of Appeals,
Fifth Circuit.

Nov. 26, 1985.

Wilson, Williams & Molberg, Kenneth H. Molberg, Dallas, Tex., for plaintiff-appellant.

Joseph G. Werner, Dallas, Tex., Vonciel Hill, Legal Office, Dallas/Fort Worth Reg. Airport, for defendants-appellees.

Before GOLDBERG, REAVLEY, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge.

The appeal in this Title VII action is brought by a class of black plaintiffs challenging the district court's denial of their requested injunction to prohibit the City of Dallas, Texas from utilizing three specified eligibility criteria for hiring of its police officers. The criteria at issue concern educational attainments, marihuana usage, and driving records. The district court, although finding no discriminatory intent in the adoption or employment of these criteria, determined that they had an adverse disparate impact on black applicants, but were nevertheless sufficiently job related to be valid. In this appeal, plaintiffs challenge the job relatedness determination.

### Facts and Proceedings Below

The Dallas Police Department requires that applicants for positions on its police force, at the time of application, (1) must have completed forty-five semester hours of college credit with at least a "C" average at an accredited college or university, (2) must not have a history of "recent or excessive marijuana usage" as determined by the Department's marihuana usage chart, and (3) must not have been "convicted of" more than three "hazardous traffic violations" in the twelve months, nor convicted of more than six such violations in the twenty-four months, preceding the date

of application. Once an applicant has been hired, he or she must go through academy training, field training, and probation before attaining "permanent" status; the "four-step process leading from citizen to sworn officer [lasts] ... approximately 95 weeks." *Davis v. City of Dallas*, 483 F.Supp. 54, 56 (N.D.Tex.1979) (Higginbotham, J.). Only the initial hiring stage is at issue in this appeal.

The Department rejected appellant Brenda Davis for employment on the ground that she had falsified her employment application; she alleged that she was rejected on the ground that she was a black female. Appellant Cynthia Jayne Durbin was hired as an officer, but subsequently was discharged on the ground that her performance during field training was unsatisfactory; she alleged that her dismissal was gender based. Both Davis and Durbin filed actions against the City of Dallas and certain officials alleging employment discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* In July 1978, on motion of the plaintiffs, the two cases were certified as class actions. Davis and Durbin acted as class representatives on behalf of all women and blacks who had been denied permanent employment with the Department from August 1, 1973, to the date of certification.

Following consolidation, the liability portion of the case was tried to the bench in September 1979. The district court held that the City of Dallas had discriminated against blacks in its hiring of police officers but not against women. Class-wide liability was established with regard to the hiring of blacks. The court reached this conclusion after finding that although "the City was acting in good faith," its selection process had an adverse disparate impact on black applicants. *Davis*, 483 F.Supp. at 58–59. This disparate impact was not negated by the City's special affirmative efforts to recruit blacks. *Id.* Subsequently, the parties attempted to eliminate or modify selection devices in the Department's hiring criteria. The parties, however, failed to reach agreement on some selection criteria.

In March 1980, the district court denied the defendants' motion to reconsider its finding of liability as to the class of black applicants. The court also noted that the plaintiffs' complaint included a request for an injunction barring the defendants from using discriminatory selection criteria in future police officer hiring. The court observed that the City was in the process of conducting a study on whether the challenged selection criteria were job related, and that these criteria might be insulated from injunction if the defendants could show that they "have a significant and demonstrable relationship to performance as a police officer." The court directed the plaintiffs to submit a proposed injunction, after which a hearing would be scheduled for taking any additional validation evidence. *Davis v. City of Dallas*, 487 F.Supp. 389, 394–95 (N.D.Tex.1980) (Higginbotham, J.).

In June 1981, the plaintiffs applied for injunctive relief. The case was transferred to a different district judge. After considerable delay, the district court held an evidentiary hearing on plaintiffs' request for an injunction. All but three of the challenged criteria had already been eliminated or modified to the satisfaction of the parties. The sole issue was whether the three remaining challenged requirements, concerning college credit, marihuana usage, and hazardous traffic violation convictions, were job related. The court concluded that they were, and denied injunctive relief on August 24, 1984.

### Discussion

The City conceded below that the challenged requirements have a statistically significant disparate impact on blacks. On appeal, appellants argue that the district court erred in finding that the City sustained its burden of establishing the validity or job relatedness of the three challenged criteria. Having determined that the district court's findings that the three requirements are job related are not clearly

erroneous,[1] we affirm the denial of the requested injunction. We examine the three challenged conditions in turn.

## I. College Credit Requirement

Appellants argue that the City at most has established that the requirement of forty-five hours of credit at an accredited college or university might tend to improve or enhance police performance. They argue that appellees failed to meet their burden of proving that the requirement is a business *necessity* in the sense that applicants who lack the requisite hours could not perform *adequately* in the position of police officer. Our examination of appellants' argument requires an analysis of the development of the business necessity or job relatedness defense in Title VII disparate impact suits.

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court addressed whether an employer was barred under Title VII of the Civil Rights Act of 1964[2] from requiring a high school diploma or passage of a standardized general intelligence test as a condition to employment in or transfer to higher paying skilled laborer jobs where (a) the job requirements had not been shown to be "significantly related to successful job performance," (b) the requirements operated to disqualify blacks at a substantially higher rate than whites, and (c) the skilled laborer positions in question previously had been filled only by whites "as part of a longstanding practice of giving preference to whites." 91 S.Ct. at 851. The Court concluded that even though there was no evidence that the requirements had been instituted for a racial purpose, their use was barred under Title VII. The Court wrote:

1. In reviewing the district court's findings on the issue of business necessity, we apply the clearly erroneous standard. *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1182 (5th Cir.1976); *Spurlock v. United Airlines, Inc.*, 475 F.2d 216, 219 (10th Cir.1972). *But see* note 15, *infra*.

2. Title VII, 42 U.S.C. § 2000e–2, provides:
   "(a) It shall be an unlawful employment practice for an employer—

"The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 91 S.Ct. at 853.

The Court, however, noted that Congress did not intend by Title VII "to guarantee a job to every person regardless of qualifications." 91 S.Ct. at 853. The Court wrote:

"In short, the [Civil Rights] Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of *artificial, arbitrary,* and *unnecessary* barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classifications.

"... The touchstone is *business necessity*. If an employment practice which operates to exclude Negroes cannot be shown to be *related to job performance*, the practice is prohibited.

" . . . .

"... Congress has placed on the employer the burden of showing that any given requirement [which has a disparate impact on a racial group] must have a *manifest relationship to the employ-*

" . . . .

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

*ment* in question." 91 S.Ct. at 853–54 (emphasis added).

The Court noted that no showing of job relatedness had been made by the employer, and consequently barred future use of the high school education requirement as a condition to employment *at that particular company.*

In *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court examined the *Griggs* requirement that any condition to employment having a disparate impact on blacks must be shown by the employer to be justified by business necessity. *Albemarle* was a class action by present and former black employees at a paper mill who alleged, *inter alia,* that a company policy requiring applicants for the skilled laborer lines of progression to have a high school diploma and to pass two intelligence tests had a disparate impact on blacks. The Court reiterated that once a "complaining party or class has made out a prima facie case of discrimination, *i.e.,* has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants," the employer is required to show that the offending requirement bears " 'a manifest relationship' " to the employment in question. 95 S.Ct. at 2375. The Court added that once an employer has made this showing, "it remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' " 95 S.Ct. at 2375 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973)). The *Albemarle* Court noted that the employer had engaged an expert in industrial psychology to " 'validate' the job relatedness of its testing program," 95 S.Ct. at 2377, but held that the validation study failed to show that the requirement that applicants pass two intelligence tests bore the required manifest relationship to the employment in question. The Court observed that the expert had merely devised a study, which was

then "conducted *by plant officials, without his supervision.*" 95 S.Ct. at 2377 (emphasis added). Moreover, the "study" required supervisors *within the company* to rank each employee, relative to each of his co-workers, as a means of determining whether the employee's performance on the tests was predictive of his success as a worker; the only guarantee of reliability was that the supervisors were not apprised of employees' test scores prior to the ranking. 95 S.Ct. at 2377–79. Drawing on these facts, the Court wrote:

> "It cannot escape notice that Albemarle's study was conducted by plant officials, without *neutral,* on-the-scene oversight, at a time when this litigation was about to come to trial. Studies so closely *controlled by an interested party in litigation* must be examined with great care." 95 S.Ct. at 2379 n. 32 (emphasis added).

It noted that there was "simply no way to determine whether the criteria *actually* [emphasis in original] considered [by the supervisors] were sufficiently related to the Company's legitimate interest in job-specific ability to justify a testing system with a racially discriminatory impact." 95 S.Ct. at 2379. The Court outlined a more suitable approach for employers seeking to establish the job relatedness of an employment condition which has been shown to adversely affect a particular racial group:

> "The EEOC has issued 'Guidelines' for employers seeking to determine, through professional validation studies, whether their employment tests are job related. 29 C.F.R. pt. 1607. These Guidelines draw upon and make reference to professional standards of test validation established by the American Psychological Association. The EEOC Guidelines are not administrative regulations promulgated pursuant to formal procedures established by the Congress. But, as this Court has heretofore noted, they do constitute '[t]he administrative interpretation of the Act by the enforcing agency,' and consequently they are 'entitled to

great deference.'" 95 S.Ct. at 2378 (quoting *Griggs,* 91 S.Ct. at 854).[3]

In both *Griggs* and *Albemarle,* the Court addressed the business necessity of employer job requirements for persons seeking positions as laborers, albeit in skilled positions. The Court in neither case suggested that the skills required for the job positions in question were so indefinable that validation might pose a problem, nor that the positions in question were noteworthy for their dangerousness or importance to the public welfare. The *Albemarle* Court seemed to presuppose that the skills required for the positions in question were capable of specific identification and quantification when it stated, "The study in this case involved no analysis of the attributes of, or the particular skills needed in, the studied job groups." 95 S.Ct. at 2378. By criticizing the study on this ground, the Court apparently believed that such an analysis was possible.

We examined Title VII's requirement of job relatedness for job requirements having a discriminatory effect in *Watkins v. Scott Paper Co.,* 530 F.2d 1159 (5th Cir. 1976). There, black employees at a pulp and paper mill alleged that the mill's testing and educational requirements for employees desiring to transfer to higher lines of progression had a disparate impact on blacks and were insufficiently job related. Depending on the particular line of progression involved, the company required an education level ranging between fourth grade and completion of high school. Regarding the requirement that employees seeking to enter into or progress within certain lines had to have a high school education, we wrote:

> "If [an employer] ... wishes to validate any barrier to the advancement of affected class members to their rightful places, it has the burden of showing business necessity. Then, even assuming that non-high school graduates do not perform *as well as* high school graduates, the question should be whether non-high school graduates perform *adequately.* For only if the diplomaless individual is not adequate to a job may his exclusion from that job be deemed a business necessity." 530 F.2d at 1180 (emphasis in original).

As in *Griggs* and *Albemarle,* however, the positions at issue in *Watkins* were skilled labor jobs: welders, pipefitters, machinists, carpenters, sheet metal workers, brick masons, and painters. 530 F.2d at 1165. Although the district court found that some workers would be in charge of the boiler room, and hence would have some responsibility for the safety of everyone in the plant, 530 F.2d at 1179,[4] this Court rejected the notion that elimination of the high school diploma requirement would "result in unqualified employees being thrown into impossible situations, an outcome clearly not intended by Title VII." 530 F.2d at 1181.[5]

3. *See* note 17, *infra* (discussing applicability of guidelines).

4. The district court, however, did not indicate that any *one* worker would have sole responsibility for operating the boiler. We quoted the district court's finding that "employees 'must be able to monitor a complex control panel in order to prevent explosive situations from developing in the boilers. Failure of the workers to do *their* job properly would put all of the employees in the entire plant in extreme danger.'" 530 F.2d at 1179 (emphasis added). The possibility that the plant might hire a minimally qualified applicant for a job involving serious risk and responsibility was apparently not a significant consideration since development of such a situation would likely depend on the failure of several workers to do their jobs properly.

5. In *Watkins,* we relied in part on similar cases in which we had rejected the job relatedness of educational requirements as conditions for employment in certain blue-collar positions. In *United States v. Georgia Power Co.,* 474 F.2d 906 (5th Cir.1973), we affirmed a district court decision which struck down a high school diploma requirement for employment in skilled labor positions in an electrical power plant. The company had sought to justify the requirement on the ground that employees eventually would be required to read and comprehend technical literature. The district court rejected this excuse, noting that "'[m]any high school courses needed for a diploma (history, literature, physical education, etc.) are not necessary for these abilities [to read technical literature]. A new reading and comprehension test ... might legitimately be used for this job need.'" 474 F.2d at

■ The instant context is distinguishable from those presented in the foregoing decisions, where we struck down education requirements for jobs which involved neither professional type positions nor an especially unusual degree of risk or public responsibility. Unlike other work positions this Court or the Supreme Court has considered, the position of officer on the Dallas police force combines aspects of both professionalism and significant public risk and responsibility. We regard this distinction as crucial, and affirm the district court's finding that appellees' educational requirement bears a manifest relationship to the position of police officer.

While courts have "consistently condemned as discriminatory the requirement of a high school diploma" for most positions, and by implication any requirement of college credit, educational requirements for *police officers* have been "consistently sustained." Hunt & Pazuniak, *Special Problems in Litigating Upper Level Employment Discrimination Cases*, 4 Del.J. Corp.L. 114, 134 & n. 70 (1978). *See also* M. Miner & J. Miner, *Employee Selection Within the Law*, 26 (1976). Courts that have addressed the issue of educational requirements for employment as a police officer have uniformly recognized the unusual nature of the position and have held that the requirements were appropriately job related.[6] We examine these unusual aspects in turn.

918. Similarly, we reversed a decision which refused to enjoin educational and testing requirements as a condition to admittance in a pipe company's apprentice program in *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir.1974). The apprentice program was a means offered by the company for its employees to train for "higher paying craft jobs" such as mechanic, machinist, electrician, carpenter, molder, pattern maker, welder, scale mechanic, bricklayer, plumber, and tinsmith. 494 F.2d at 236. The company tried to justify the requirement on the ground that "a certain reading level and familiarity with study technique [was] ... necessary to participate in the course work of the apprentice program." 494 F.2d at 237. We rejected this reasoning for the same reasons expressed in our *Georgia Power Co.* decision. *Id.* at 237–38, 245. We also considered the effects of an educational requirement in *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir.1974). There, a synthetic rubber plant had imposed a requirement that persons seeking employment in or transfer to seven of the plant's eight departments had to have a high school diploma and pass certain written tests. The plant subsequently eliminated the education requirement, but continued a departmental seniority system under which black employees were effectively locked into the lowest paying department because they previously had been unable to transfer into one of the seven departments that had then maintained the high school education requirement. We affirmed a district court decision enjoining "further application" of the high school diploma requirement "until such time as [the employer] ... could validate its continued imposition." 491 F.2d at 1372.

We followed these cases in *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 355 (5th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). As did *Pettway*,

*James* dealt with an educational requirement for admittance to an apprenticeship program for skilled labor positions. The program trained employees for such "craft skilled maintenance positions" as millwright, electrician, carpenter, pattern maker, blacksmith, and machinist, and such "craft skilled production jobs" as box floor melter, ductile melter, oven operator, crane operator, heat treater, and service mechanic. 559 F.2d at 317. We reversed a judgment for the employer and held, *inter alia,* that the district court on remand "should enjoin the use of the high school education ... requirements for apprenticeship training until the requirements have been validated by ... [the employer]." 559 F.2d at 355.

In each of the foregoing decisions by this Court, we examined educational requirements in the context of skilled labor positions which involved relatively readily definable tasks and abilities, and did not involve unusual dangers or responsibilities to the public at large. Some scholars have distinguished our analysis on the basis of the type of job position that was at issue. *See, e.g.,* Gwartney, Asher, Haworth & Haworth, *Statistics, the Law and Title VII: An Economist's View*, 54 Notre Dame Law, 633, 645 (1979) ("The inference of the Fifth Circuit's reasoning [in *James*] is that individuals with, say, a primary school education, are of equivalent value with other employees who have completed high school—*at least for an industrial employer hiring blue-collar workers.*" (Emphasis added.)).

6. The First Circuit, in *Castro v. Beecher*, 459 F.2d 725, 735 (1st Cir.1972), affirmed in pertinent part a district court decision which upheld a requirement that applicants for positions as Boston police officers have either obtained a high school diploma, obtained a high school equivalency certificate, or served three years in the armed forces. The Court wrote:

Note 6—Continued

"[W]e agree with the district court that the requirement is clearly valid. Importantly, it is supported by a 'meaningful study of [its] relationship to job-performance ability.' *Griggs v. Duke Power Co. . . .* We refer to the 1967 report of the President's Commission on Law Enforcement and Administration of Justice, 'The Challenge of Crime in a Free Society,' pp. 106–10, its underlying 'Task Force Report: The Police,' pp. 126–28, and the subsequent 1968 'Report of the National Advisory Commission on Civil Disorders,' p. 166. A *high level of education for police officers was* a central concern of the first-named report. Indeed, the Commission recommended (p. 109) that 'The ultimate aim of all police departments should be that *all personnel with general enforcement powers have baccalaureate degrees.*' . . . The point is, . . . a high school education is viewed as a bare minimum for successful performance of the policeman's responsibilities. These reports . . . constituted a deliberate value judgment that professionalization of the police is a major goal in our increasingly complex society." (Footnote omitted and emphasis added.)

The First Circuit went on to note that the first referenced report recommended that "'every department . . . insist *immediately* that *all recruits* . . . have both a high school diploma *and a demonstrated ability,* measured by appropriate tests, *to do college work,'*" and that seventy percent of all police forces already imposed a high school diploma requirement. 459 F.2d at 735 n. 11 (emphasis added).

An applicant for a position on the Boston force, in satisfying the job requirement, could qualify for employment by passing an equivalency examination which tested skills that on the surface seemed unrelated to many of the tasks the applicant would perform as a police officer. The district court's opinion noted that an applicant who qualified under the equivalency certificate route would have been required to pass five tests written in English and covering "(1) spelling, punctuation, and grammar, (2) social studies, (3) natural sciences, (4) comprehension of selections of prose and poetry, and (5) general mathematics." *Castro v. Beecher,* 334 F.Supp. 930, 938 n. 7 (D.Mass.1971) (Wyzanski, J.). Judge Wyzanski wrote that "[p]olicemen, . . . *unlike some other types of employees,* . . . are in a calling in which book knowledge is an important element and there is a constant demand for the performance of intellectual as well as physical tasks." *Id.* at 939 (emphasis added). Although *Castro* was not a Title VII case, the First Circuit nevertheless applied the *Griggs* Title VII disparate impact standards. *Castro,* 459 F.2d at 732–33.

The district courts also have *uniformly* sustained educational requirements as a condition to employment as a police officer. In *Arnold v. Ballard,* 390 F.Supp. 723 (N.D.Ohio 1975), the district court sustained a requirement of a high school diploma or General Educational Devel-

opment certificate for a position on the Akron police force. The court concluded that the educational requirement was "substantially job-related and . . . [was] a valid requisite for employment as a policeman even if a higher proportion of blacks . . . [were] disqualified because of it." 390 F.Supp. at 728. The district court added that the requirement was "somewhat arbitrary in nature but . . . [did] indicate a measure of accomplishment and ability which . . . [was] *essential for initial training and performance as a police officer.*" 390 F.Supp. at 738 (emphasis added). The district court in *League of United Latin Am. Citizens v. City of Santa Ana,* 410 F.Supp. 873 (C.D.Cal.1976), took note of our decisions in *Pettway, Johnson,* and *Georgia Power (see* note 5, *supra),* as well as *Griggs,* but found the cases distinguishable as holding "'on the record' before [the respective courts] . . . that the high school completion requirement" did not bear the relationship required under *Griggs.* 410 F.Supp. at 900 (emphasis added). The district court noted the "reports of Presidential Commissions" and concluded:

"The courts in *Castro* and *Ballard,* on evidence similar to that presented in this case, concluded that a high school education requirement was a reasonable prerequisite for employment as a police officer. There is no basis for a different determination here." 410 F.Supp. at 901 (footnote omitted).

An identical result was reached in *United States v. City of Buffalo,* 457 F.Supp. 612 (W.D.N.Y. 1978), *modified on other grounds and aff'd,* 633 F.2d 643 (2d Cir.1980) (per curiam), in which the district court, citing to *Castro, Arnold,* and *City of Santa Ana,* held:

"In the patrolman case, I find that the requirement [of a high school education or equivalency certificate] has been validated by a 'meaningful study of their relationship to job-performance ability' as required by *Griggs* . . . . I refer to the 1967 report of the President's Commission on Law Enforcement and Administration of Justice, . . . its underlying 'Task Force Report: The Police,' . . . and the subsequent 1968 'Report of the National Advisory Commission on Civil Disorders'. . . . The level of education required for police officers was a central concern of these reports. The conclusion which they reached is that a high school education is a bare minimum requirement for successful performance of the policeman's responsibilities. This reasoning has been followed by several courts to uphold the high school requirement. . . . I find the reports and the cases cited to be ample support for continuation of the diploma requirement for police patrolmen." 457 F.Supp. at 629.

The line of cases upholding educational requirements for police officer positions has been drawn on to sustain by analogy a high school education requirement for correctional officers in Cook County, Illinois. *Aguilera v. Cook*

*Public Risk and Responsibility*

In the significant case of *Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir.1972), the Tenth Circuit dealt with whether certain requirements for the position of airline flight officer, including the requirement of a college degree, were job related within the meaning of *Griggs.* The Court wrote:

> "When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminate against minorities. In such a case, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job-related. *On the other hand, when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a corresponding lighter burden to show that his employment criteria are job-related. Cf.* 29 C.F.R. § 1607.-5(c)(2)(iii).... *The courts, therefore, should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job."* 475 F.2d at 219 (emphasis added).

*Spurlock* has been approved by six other Courts of Appeals, and has been expressly rejected by none. *See Townsend v. Nassau County Medical Center*, 558 F.2d 117, 120 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 759 (1978); *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1262–63 (6th Cir.1981); *Hodgson v. Greyhound Lines, Inc.*, 499

F.2d 859, 862–63 (7th Cir.1974), *cert. denied sub nom. Brennan v. Greyhound Lines, Inc.*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975); *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir.1977); *Harriss v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 675 & n. 4 (9th Cir.1980) (discussion in context of "Business Necessity defense" in related bona fide occupational qualification issue); *Walker v. Jefferson County Home*, 726 F.2d 1554, 1558–59 (11th Cir.1984) (Tuttle, J.). *Cf. Watkins*, 530 F.2d at 1182 n. 32 (noting that *Spurlock* and *Castro* were "factually distinguishable from the instant case" and "unpersuasive" as to the particular position requirement then before this Court); *Equal Employment Opportunity Comm'n v. Ball Corp.*, 661 F.2d 531, 541 n. 20 (6th Cir.1981) (noting that *Spurlock* standard "applies only to that narrow category of jobs which greatly implicate human safety, *e.g.* airline piloting and over-the-road truck driving"); *Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830, 837 (D.C.Cir.1977) ("We cannot earnestly compare the training program of a securities sales representative with that of a flight officer who ultimately is responsible for the safety of passengers as well as costly aircraft [as in *Spurlock*]. In the latter, *public interest is paramount and justifies high employment standards."* (Emphasis added.)); *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 236 n. 28 (5th Cir.1976) ("the indefinite nature of the common law job-relatedness test *may* necessitate the imposition of a lighter burden when the safety of third parties is implicated" (emphasis added)).[7]

Note 6—Continued

*County Police & Corrections Merit Bd.*, 582 F.Supp. 1053 (N.D.Ill.1984). The district court there noted that the job of correctional officer was "comparable to that of a police officer" because of the type and level of training, the need to fill out detailed reports and to handle inmates of diverse backgrounds, their similar function as peace officers, and the fact that both positions authorized the officer to carry firearms. The district court also observed that both positions contained "a high potential for abuse due to the inherent power in that position." 582 F.Supp. at 1057. The court concluded:

"Because of the great similarity between the two positions, the Court concludes that defendant has carried its burden of demonstrating that the high school education requirement is job related." *Id.*

7. *See also Lightfoot v. Board of Trustees of Prince George's Community College*, 457 F.Supp. 135, 143–44 (D.Md.1978) (quoting *Spurlock*); *Rice v. City of St. Louis*, 464 F.Supp. 138, 142–43 (E.D.Mo.1978), *aff'd*, 607 F.2d 791 (8th Cir.1979) ("The relative function of the academic prerequisites to job relatedness varies inversely with

The Sixth Circuit, in *Chrisner* construed *Spurlock* as creating a spectrum:

"Application of the business necessity defense entails considerations which are a function of the job's demands. In this regard, positions can be evaluated according to their location on the type of spectrum described in *Spurlock*.... Since a flight officer is ultimately responsible for the safety of passengers as well as costly aircraft, the public interest is paramount, justifying high employment standards. An industry with the primary function of managing the safety of large numbers of passengers *must be allowed more latitude in structuring the requirements which could effect [sic] the performance of a primary business objective....*

"... The important public interest in safety ... is sufficiently weighty to convince us that [the instant job requirement] ... is manifestly related to the safe and efficient operation of its business...." 645 F.2d at 1262–63 (emphasis added).

The Seventh Circuit in *Hodgson* similarly stated that where the employee would be entrusted with "the lives and well-being" of the public, the employer "must continually strive to employ *the most highly qualified persons available.*" 499 F.2d at 863 (emphasis added). The *Hodgson* Court added that because of the paramount importance of safety in the performance of the job at issue in that case, intercity bus

driver, it would *not* require the employer to show that "all or substantially all ... [applicants who failed to meet the requirement] could not perform safely." *Id.* Rather, the Seventh Circuit held that employer "need only demonstrate ... a minimal increase in risk of harm[,] for it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice." *Id.*

Although this Court has not previously joined the majority of Circuit Courts approving the rule announced in *Spurlock*, we have recognized the same general principle in the context of cases involving the issue of bona fide occupational qualifications.[8] In *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir.1976), we examined whether a bus company's policy of refusing to consider applicants above the age of forty for initial employment as an intercity bus driver was reasonably necessary to the normal operation of its business. We concluded that a district court finding that the job requirement was necessary was not clearly erroneous, and affirmed. We wrote:

"[The B.F.O.Q. test] mandates that the job qualifications which the employer invokes to justify his discrimination must be *reasonably necessary* to the essence of his business—here, the *safe* [emphasis in original] transportation of bus passengers from one point to another. *The greater the safety factor, measured by*

the risks to the health and safety of the public who depend upon the technology.... The human risks to health, safety and even life dependent upon competent [public health program representative] performance are great. A college degree while not always absolutely indicative of the knowledge and abilities required to perform such a position has nonetheless been shown in the present case to be substantially job related."); *Boyd v. Ozark Air Lines, Inc.*, 419 F.Supp. 1061, 1064–65 (E.D.Mo.1976), *aff'd*, 568 F.2d 50 (8th Cir.1977) (following *Spurlock* to sustain a height requirement for pilots); *Harriss v. Pan Am. World Airways, Inc.*, 437 F.Supp. 413, 432–34 (N.D.Cal.1977), *aff'd in pertinent part*, 649 F.2d 670 (9th Cir.1980) (employer, "entrusted as a carrier with the lives and well-being of its passengers, has an obligation at all times to

employ the most highly qualified persons in positions affecting the safety of passengers").

8. "Both the business necessity and B.F.O.Q. [bona fide occupational qualification] defense are designed to require that employment practice be related to the legitimate needs of the employer's particular business.... In order to survive a showing of discriminatory impact [through application of either defense], an employment practice must be shown to be necessary to the safe and efficient operation of a business." *Harriss v. Pan Am. World Airways, Inc.*, 437 F.Supp. 413, 432 (N.D.Cal.1977), *aff'd in pertinent part*, 649 F.2d 670 (9th Cir.1980) (applying business necessity and B.F.O.Q. cases interchangeably in analyzing whether a requirement was job related within the meaning of *Griggs*).

*the likelihood of harm and the probable severity of that harm* in case of an accident, *the more stringent may be the job qualifications* designed to insure safe driving.... (Emphasis added.)

"It is important to understand that once an employer's job qualifications have passed muster under ... [the safety factor aspect of the B.F.O.Q. test], the [other] element[s] do not mandate hiring applicants who do not meet these perhaps stringent qualifications.... The [B.F.O.Q. requirement] ... does *not* [emphasis in original] mandate either the hiring of unqualified applicants *or applicants whose qualifications cannot be reliably determined,* whether or not they are black or female or over 40 years old." 531 F.2d at 236 (emphasis added). *See also Harriss,* 649 F.2d at 675 n. 4 ("Federal courts have uniformly recognized the relevance of the safety factor in assessing whether an employment policy is justified as a B.F.O.Q." (Citing *Usery* and *Hodgson.*)).

We have no difficulty with equating the position of police officer in a major metropolitan area such as Dallas with other jobs that courts have found to involve the "important public interest in safety," *Chrisner,* 645 F.2d at 1263, to carry "responsib[ility] for the safety of" the public, *id.* at 1262, to be "entrusted with the lives and well-being" of citizens, *Hodgson,* 499 F.2d at 853, or to involve "risks to ... safety and even life," *Rice v. City of St. Louis,* 464 F.Supp. 138, 143 (E.D.Mo.1978), *aff'd,* 607 F.2d 791 (8th Cir.1979). As the district court in the instant case noted, even a rookie police officer must have "the ability to handle tough situations with a gun." The district court found that a *"significant* part of a police officer's function involves his activities as a keeper of the peace—his ability to function effectively as a crisis intervenor in family fights, teen-age rumbles, bar brawls, street corner altercations, racial disturbances, riots and similar situations." (Emphasis added.) The court also found that Dallas police officers frequently

are required to perform their job from patrol cars, which necessarily entrails risk to "lives and property ... each time a Dallas police officer operates a squad car." Drawing on these facts, it concluded that

"[f]ew professionals are so peculiarly charged with individual responsibility as police officers. Officers are compelled to make instantaneous decisions, often without clearcut guidance from the Legislature or departmental policy, and mistakes of judgment could cause irreparable harm to citizens or èven to the community."

The degree of public risk and responsibility which the job of Dallas police officer entails, considered alone, would warrant examination of the job relatedness of the City's education requirement under the lighter standard imposed under *Spurlock* and its progeny. We now turn to consider other aspects of the position of Dallas police officer which further relevantly differentiate it from the more routine, nonprofessional variety of job most frequently considered in Title VII disparate impact cases.

### *Identification and Quantification of Necessary Professional Skills*

Many professional type positions, unlike the jobs considered in *Griggs* and in this Court's previous Title VII business necessity cases,[9] require some skills or abilities which are extremely difficult to define with significant precision and even harder—to the extent so identified—to test for or measure. Hunt & Pazuniak, *supra,* at 132; Waintroob, *The Developing Law of Equal Employment Opportunity at the White Collar and Professional Level,* 21 Wm. & Mary L.Rev. 45, 67 (1979); Gwartney, Asher, Haworth & Haworth, *Statistics, the Law and Title VII: An Economist's View,* 54 Notre Dame Law, 633, 641–42 (1979); *cf. Vuyanich v. Republic Nat'l Bank of Dallas,* 505 F.Supp. 224, 371 (N.D.Tex.1980) (Higginbotham, J.), *vacated on other grounds,* 723 F.2d 1195 (5th Cir.), *cert. denied* —— U.S. ——, 105 S.Ct. 567, 83

---

9. *See* note 5 and accompanying text, *supra.*

L.Ed.2d 507 (1984) (discussing the "difficulty of quantifying and measuring the intangible skills which ... professional employees must bring to their jobs" in context of *subjective* employment decision-making process). The fact that certain job qualification factors are difficult or impossible to quantify, however, should not suggest that they are not necessary skills which an employer legitimately could require of potential employees. *See* Gwartney, Asher, Haworth & Haworth, *supra*, at 642.

The district court in the instant case found that the job of Dallas police officer falls within that category of professional type positions, the job-related skills of which are especially difficult to precisely define, test for, and quantify.[10] It stated that the "characteristics which must be found in an applicant and rookie officer are not easily measured in terms of statistical analyses, such as individual judgment, ability to intervene in volatile situations (*i.e.,* domestic quarrels), ability to make important decisions, or presence and performance as a witness in Court. The problem is one of measuring maturity and the ability to handle tough situations with a gun." Although the district court acknowledged that a "professional position such as a police officer" involves " 'undeterminable' characteristics," the court endeavored to identify some necessary aspects of that job: the need to understand "the legal issues involved in his every day work, the nature of the social problems he constantly encounters, the psychology of those people whose attitudes towards the law differs from his"; the need to "possess a high degree of intelligence, education, tact, sound judgment, impartiality and honesty"; and the ability to intervene effectively in a variety of crisis situations. Because of the extent to which the skills required of an officer were not definable with significant precision, the district court suggested that the degree of validation required of the City of Dallas to sustain the educational requirement for police officers was less than would be required to show job relatedness for other positions.[11]

We likewise conclude that the professional nature of a Dallas police officer's job distinguishes it in these respects from positions which previously have been evaluated in the Title VII decisions of the Supreme Court and this Court. Job positions filled by both skilled and unskilled craftsman and laborers, as well as many other categories of employment, typically involve the performance of discrete tasks, both the result and the performance of which can be readily evaluated. Normally in such jobs, the occasions for the exercise of discretion are rare, and the discretion is exercised within narrow and relatively well-defined limits. Generally speaking, the underlying qualifications which an employer might seek in a competent craftsman similarly are, relative to most professional type positions, more susceptible to precision in definition, identification, and accurate measurement, and more likely to be static from employee to employee. Similarly, the concept of "adequate" performance or of what constitutes a minimally qualified employee is a fair measure of what qualifications an employer might legitimately test for in applicants for craft, labor, and similar positions. The factors that combine to produce a qualified police officer, on the other hand, are far less susceptible to precise definition and to identification and quantification in individu-

---

**10.** The district court effectively distinguished the job of police officer from the craft positions we previously have addressed in *Watkins* and related cases. The court wrote that the job requirements of an applicant for the police force are "not as measurable as qualities involving, for instance, blue collar-type work."

**11.** *See* note 10, *supra.* The district court faulted the EEOC guidelines for failing to "take into consideration the 'undeterminable' characteristics of a professional position such as a police

officer." The district court relied on expert testimony and studies, examined *infra,* to sustain the validity of the requirement of forty-five hours of college credit. By implication, the district court did not consider compliance with the validation methods outlined in the EEOC guidelines to be necessary to validate requirements for a position such as police officer. The district court, though, *did* apply the *Griggs* analysis of whether each of the requirements constituted a business necessity.

al cases. They are also less likely to be uniform in their mix from officer to officer. Although certain qualities that might be found in a successful police officer come to mind—maturity, judgment, and the ability to handle pressure, among others—these concepts themselves are difficult to precisely define or to break down into component skills. Further, the "difficulty of devising mathematical tests for [such] subjective qualifications" makes "formal validation" through the use of empirical evidence "a virtual impossibility." *Vuyanich*, 505 F.Supp. at 371 (Higginbotham, J.). Even if appropriate skills could be accurately tested, the combination of skills that would be found in a successful officer would vary from one policeman to the next.

Moreover, the responsibility and potential for danger and abuse inherent in the position make the question of what constitutes a *minimally* qualified or "adequate" police officer a less appropriate standard for selecting members of the force than would be the case in most other job positions, let alone the positions this Court has had occasion to examine in the context of a Title VII suit. *See Hodgson*, 499 F.2d at 863 (where employee will be entrusted with the "lives and well-being" of the public, the employer "must continually strive to employ *the most highly qualified persons available*" (emphasis added)); *Spurlock*, 475 F.2d at 219 (where there are human

risks involved "in hiring an unqualified applicant," courts "should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job"); *Kinsey*, 557 F.2d at 837 (where job involves responsibility for the safety of others, the "public interest is paramount and justifies high employment standards"); *Chrisner*, 645 F.2d at 1262–63 (where safety of others is implicated by position, employer "must be allowed more latitude in structuring the requirements which could effect [*sic*] the performance of a primary business objective").

Because of the professional nature of the job, coupled with the risks and public responsibility inherent in the position, we conclude that empirical evidence is not required to validate the job relatedness of the educational requirement.[12] This is not to say, of course, that validation is not required. We simply recognize that the danger the hiring of an unqualified police officer might pose to the public and the impossibility of reducing job characteristics to measurable components separate the position of police officer from jobs considered in cases where validation studies were required. Therefore, we reject appellants' argument that the City failed to meet its burden of proving job relatedness simply because it failed to offer an empirical study on the necessity of the educational requirement to police performance. As the *Spur-*

12. In *Vuyanich*, Judge Higginbotham, then of the district court, wrote:

"The EEOC guidelines purport to apply not only to formalized tests but to all other measures of employee qualification. 29 C.F.R. § 1607.2(B). Nevertheless, several courts have suggested that a lesser quality of proof is sufficient to establish the job-relatedness of college degrees for managerial, professional, and other white-collar positions. . . .

"One reason for this apparent willingness to relax stringent validation requirements may lie in the lesser potential for abuse of academic credential requirements compared to employment tests. Most such tests are employer-scored; many are employer-created. Usually no objective outsider has determined whether the tests accurately measure *any* particular skill [emphasis in original], much less skills in the position for which the tests are being administered. In such a situation, the

potential for deliberate use of the tests as racial or sexual screening devices is high. Even if no overtly discriminatory motive is present, the use of the tests by an employer not qualified to judge their relevance creates the risk that minorities or females may be needlessly excluded from positions for which they are actually qualified. *In contrast, a college degree reflects the judgment of a comparatively neutral institution, better qualified and with greater opportunity than the employer to assess an individual's credentials, that the recipient has reached a threshold level of competence in a given field.* The risk still remains that an employer will erroneously require a greater degree of knowledge and skill than is appropriate; more objective measurement of competence nevertheless suggests that the need for formal validation is diminished." 505 F.Supp. at 372–73 (emphasis added and footnote omitted).

*lock* Court stated, "[W]hen the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job-related." 475 F.2d at 219 (sustaining job relatedness of college degree requirement on strength of testimony). *See also Boyd,* 568 F.2d at 54 (human risks being involved, court "cannot agree that empirical validation is required here"); *Boyd,* 419 F.Supp. at 1065 ("Empirical data is not required, *Spurlock, supra* at 219, as there is adequate *expert testimony* on this point." (Emphasis added.)); *Rice,* 464 F.Supp. at 143 (upholding college degree requirement for public health program representatives on the strength of expert testimony); *Castro,* 459 F.2d at 735 (sustaining educational requirement for police officers on strength of public reports, including the 1967 President's Commission report); *City of Buffalo,* 457 F.Supp. at 629 (same); *Arnold,* 390 F.Supp. at 728 (same); *Aguilera,* 582 F.Supp. at 1056–57 (same).

In holding that the City has a lighter burden in establishing the job relatedness of its educational requirement for police officers, we do not suggest that the validation methods of appropriate expert testimony and reports of the caliber of Presidential Commissions are any less reliable in the present context than the validation methods called for in the guidelines. As to this character of position, we endorse the view of the courts in *City of Santa Ana* and *Aguilera, supra,* which stated:

"This court ... is reluctant to accept the idea that education requirements must be empirically validated. To accept that concept would be to adopt the proposition that the empiricist's methods of arriving at truth are the only acceptable ones. It would involve the categorical rejection of reports of Presidential Commissions on the basis that they were 'unscientific.' ... It is one thing to say that paper and pencil tests must be validated by prevailing concepts of educational measurement ...; it is quite another to say that the common sense judg-

ment and reasoning of expert observers cannot be considered as relevant to the assessment of the value of institutional education to the increasingly complicated tasks of the police officer in an urban environment." *City of Santa Ana,* 410 F.Supp. at 901; *Aguilera,* 582 F.Supp. at 1057 (quoting *City of Santa Ana*).

We now consider the validation evidence introduced by the City in the instant case.

### The City's Validation Evidence

To validate its educational requirement, the City introduced evidence consisting of both nationwide studies and reports and expert testimony. The City's evidence included the 1967 report by the President's Commission on Law Enforcement and Administration of Justice, entitled "The Challenge of Crime in a Free Society." The President's Commission report stated:

"Recruitment Standards

"... From the point of view of securing recruits of the proper quality, some of these standards are too rigid, some are too lax. The Commission believes strongly that it should be the long-range goal of all departments to raise their educational standards.

*"The Commission recommends:*

"The ultimate aim of all police departments should be that all personnel with general enforcement powers have baccalaureate degrees.

"Beyond question it will take many years for a reform this sweeping to be fully implemented. It never will be implemented if a strong movement toward it does not begin at once. It should be possible, for example, for every department to insist immediately that all recruits, except community service officers, have both a high school diploma and a demonstrated ability, measured by appropriate tests, to do college work.... No doubt many police administrators will, at first glance, consider this recommendation of the Commission so radical as to be unattainable. Let them consider the fact that the median education level

for all policemen in the United States is 12.4-years, which indicates that many policemen already have done some college work. It is this trend that the Commission believes should be sharply accelerated."

The City also introduced the 1973 report of the National Advisory Commission on Criminal Justice Standards and Goals. The Commission wrote:

"To insure the selection of personnel with the qualifications to perform police duties properly, every police agency should establish the following entry-level educational requirements:

"1. Every police agency should require immediately, as a condition of initial employment, the completion of at least 1 year of education (30 semester units) at an accredited college or university....

"2. Every police agency should, no later than 1975, require as a condition of initial employment the completion of at least 2 years of education (60 semester units) at an accredited college or university.

"3. Every policy agency should, no later than 1978, require as a condition of initial employment the completion of at least 3 years of education (90 semester units) at an accredited college or university.

"4. Every police agency should, no later than 1982, require as a condition of initial employment the completion of at least 4 years of education (120 semester units or a baccalaureate degree) at an accredited college or university."

The Commission stated that "the high school level of education is a questionable standard for the selection of police officers. The high school level of education no longer serves as an index of superior educational achievement; it is common throughout the Nation.... The police once employed only persons with an above-average education; today they are employing persons with an average level of education that is fast becoming an inferior level." The Commission explained the need for its recommended educational requirement:

"Thus, police officers are left with their more essential task which includes social control in a period of increasing social turmoil, preservation of our constitutional guarantees, and exercise of the broadest range of discretion—sometimes involving life and death decisions—of any government service. The need for police officers who are intelligent, articulate, mature, and knowledgeable about social and political conditions is apparent.

"... [A] college education develops and imparts the requisite level of knowledge."

In addition to the commission reports, the City presented the testimony of four expert witnesses. David Patrick Geary, an associate professor in the Administration of Justice and Public Safety Department at Virginia Commonwealth University and a former police officer and chief of police, testified concerning a study he conducted in 1978 and 1979 on the relationship between college education and performance as a police officer. The police departments of Baltimore, Maryland and Dade County, Florida formed the basis of his study. Based on his research, other reports and studies he was acquainted with, and his observations after twenty-three years in law enforcement work, Geary concluded that there was statistically significant correlation between a college degree and overall performance as a police officer. Geary found no significant difference in overall performance between an officer who obtained a degree in criminal justice and an officer who majored in some other field. In response to the question whether he was aware of "any universally acceptable minimum standard of performance for police officers," Geary responded, "That's precisely the problem. Trying to measure what is an acceptable standard for police officers is the problem, and I'm—I'm not aware of any...." The City also presented Lawrence Redlinger, a professor of Sociology and Political Economy and Acting Dean of the School of Social Sciences at The University of Texas at Dallas. Redlinger testified that, assuming additional college leads to increased verbal and written comprehension skills, college credit

would lead "to a greater maturity and soundness of judgment, greater tolerance of ambiguous situations; and that those factors, given the modern-day nature and complicated nature of a police task, makes [*sic*] for officers with college to be better performers." He added that "officers with the education will perform better than officers who do not have it." Redlinger also testified:

"We're talking, ultimately, about comprehension and intelligence, ability to deal with complex and ambiguous situations, all of those things that come with the quality of mind that 45 hours is a surrogate variable for."

Finally, in response to the question of what "costs and consequences" would result from accepting individuals without some college education as police officers, Redlinger stated:

"So far as college education allows people to know about, among other things, the operation of the American government; allows people to have additional years of maturity; allows people to know something about—more than a rudimentary knowledge of the history of the country, and of its laws; allows them generally to be more flexible in handling what I call ambiguous situations, which involve, to me, non-clearcut criminal situations. Generally, keeping the peace. Insofar as those things are desirable, then not having them is a cost not only to policing but to the society. And that's a cost hard to measure, but one which, nevertheless, is a real cost."

Gerald Lynch, president of the John Jay College of Criminal Justice at the City University of New York, the largest college of its kind in the nation, also testified in support of the job relatedness of the City's educational requirement. Lynch had written several papers on the topic of police education and testified before committees on that subject. Lynch's testimony included the following:

"Q Dr. Lynch, do you have an opinion about whether a college level education is necessary to adequate performance as a police officer?

"A Yes, I do.

"Q On what do you base your opinion?

"A I base my opinion on the national commissions, all of which I have read, starting with the Kerner Commission in '63, which have concluded that in terms of better policing our society we should require college education for admission to police departments. The Kerner Commission, as you may know, of course, was concerned with the riots and disturbances, as was the National Advisory Commission on Criminal Justice Goals, and other commissions since the Kerner Commission 20 years ago which said that the police, indeed, were part of the problem, and had precipitated and exacerbated the conditions that led to the riots and to other social injustices.

"They all concluded that, indeed, we should require, in this most complex job, involving such discretion, college education as an entry level."

Lynch also stated, "The police officer, we believe, absolutely needs this education, because of the things he's called upon to do every day. He does have to—he's given by our society the chance to kill you with his gun, if he thinks the circumstances are permitted. Therefore, to pull that trigger, you want, I think, the intelligence and the maturity that we hope some college, the college education, will bring, in addition to growing and experiencing the world around him." Lynch added that if an officer has a college degree, "he can be less authoritarian, less threatened," when dealing with individuals at either end of the socio-economic continuum. As did Geary, Lynch testified that college education imparts qualities and abilities to recipients *regardless of the area of study*. Lynch also rejected the idea that college might be required at some point later in an officer's career rather than at the entry level, explaining, "[F]rom the moment the person leaves the academy, and frequently before they leave the academy, they have the gun, and they have the full responsibility as a police officer, and they have the full capaci-

ty to, as I say, wound or kill whomever they think should be wounded or shot.... They also have all the stress of police work from the very beginning." Lynch additionally confirmed that education would be very difficult to validate as a requirement for police officers, stating that "the subtle and important performance [requirements] of what makes a good policeman are very hard to correlate with education. It's simply very difficult. It's a complex world, and it can't be simplified as much as some people would like to quantify it. Performance requirements vary...." Lynch apparently relied in part on "several studies that have indicated that [police officers] act in a less authoritarian and more open-minded manner if they have had college education." Finally, Lynch was asked, "Is there any particular level of college that you think an officer ought to have?," to which he responded, "A baccalaureate degree."

The City's final expert witness was Julius Debro, the chairman of the Department of Criminal Justice and Criminology at Atlanta University. Debro had been associated with the Joint Commission on Criminal Justice Educational Standards, a commission "formed primarily to look at minimal standards for education for police officers." His job was to locate, review, and analyze "every study" that had been done on the subject of police education, among other subjects. In response to the question, "What sort of recommendations did those studies ultimately make?," Debro responded, "That—as I had indicated earlier, that police officers, first of all, should have, as a minimum, a requirement of a bachelor's degree." When asked whether he agreed with those conclusions, he replied, "I certainly do." Debro explained that one of the benefits is that "you get better performance; you get police officers who are less authoritarian; you improve your race relationships with ethnic groups throughout the community; police officers

generally tend to be less stressful. You improve, most of all, professionalism, in which police officers are now trying to become professional." Debro, in fact, felt that the City's requirement should "be raised higher, based on the commission's report—President's Commission's report on National Education Standards and Goals, in which their recommendation was four years of college at the year 1984." Debro also noted that the National Association of Blacks in Criminal Justice, "at its most recent meeting, also made that recommendation that they have a college degree at entry level going on the force." Like the other expert witnesses, Debro testified that "there is not" a universally accepted minimum standard of performance for police officers. Moreover, Debro discussed numerous studies which tended to show that departments that had college education requirements exhibited superior overall performance records to departments that lacked such a requirement.

Significantly, Debro, in response to a suggestion during cross-examination that Dallas police officers, prior to the imposition of a college credit requirement, on the whole made higher grade averages during academy training than the final academy average of officers who went through the academy after the requirement was imposed, responded:

"What you are saying is that the quality of education is dropping throughout the country. That when you first looked at that average a person with a high school degree then had a high school degree; the educational level was higher. As we increase that, that has begun to drop. What you need to do now is to increase your requirement, because you are not—a two-year college degree now is not like a high school diploma was twenty years ago." [13]

He added that a high school diploma "is not what it was twenty years ago," and that

---

**13.** Although the witness testified that "a two-year college degree now is not *like* a high school diploma was twenty years ago," we believe that, considering the context of his remark, he actually said or meant to say that a two-year degree today is not *"un* like" a high school diploma of twenty years ago.

"in the college level we have also decreased our expectations and our requirements"; the consequence is that two years of college training now is equivalent to what a high school education represented two decades ago.[14]

Based on the foregoing studies, reinforced by expert testimony, the district court concluded that the City met its burden of showing that the requirement of forty-five hours of college credit was job related. The court stated that the City "introduced evidence which supports the educational requirement. Numerous nationwide studies have examined the problem of setting the educational requirement for police officer departments with favorable conclusions. A college education as a condition of hiring as a police officer has been recommended by the National Commission on Law Observance and Enforcement in 1931; by the President's Commission on Law Enforcement and Administration of Justice in 1967; by the Advisory Commission on Intergovernmental Relations in 1971; by the American Bar Association in 1972; and by the National Advisory Commission on Criminal Justice Standards and Goals in 1973.

" . . . .

"Defendant's experts established the relationship between college education and performance of police officers. A study by one expert relied upon factual data from two large metropolitan areas that took two years to complete, showing significantly higher performance rates by college educated officers. Another expert testified about numerous studies and recommendations of college education for police officers. A persuasive point was made that a high school diploma today does not represent the same level of achievement which it represented ten years ago. The Court agrees with Defendant's expert's conclusions that 45 hours of college today represents [a] considerably lower level of achievement than it would have in the early 70's." [15]

The district court found that "Defendants have shown that a college education is a substitute for experience which would be lacking for rookie officers" and that education "fills the gap of inexperience in the handling of a crisis situation for an inexperienced officer." It rejected appellants' argument that older police officers, who, of course, would have obtained their high school diplomas at a time when a high school education was a more significant achievement, managed to perform well in their positions despite their lack of college training, on the ground that "[t]hey do not need college education now because they already have the professional maturity necessary to perform the job. Rookie officers have no such experience, and therefore must draw on substitutes for experience." The district court concluded that the City had "shown sufficient job relatedness or

---

**14.** He also testified, as other expert witnesses had, that "[e]ducation is very hard to—to verify empirically" and that "you cannot prove that education increases performance by empirical data, because of the many methodological problems that one runs into."

**15.** In *Dunagin v. City of Oxford, Miss.,* 718 F.2d 738, 748 n. 8 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984), we observed that the "degree to which an appellate court should defer to the 'fact' findings of a trial judge as to the latest truths in the social sciences is an interesting question." We noted that certain findings, while couched in terms of a factual determination, nevertheless are *not* "subject only to a clearly erroneous standard of review." The instant finding is likely at least in some measure or respect, as we remarked in *Dunagin,* "not a question specifically related to this one case or controversy; it is a question of social factors and happenings which may submit to some partial empirical solution but is likely to remain subject to opinion and reasoning." In *Dunagin,* we considered the relevant finding to be of a legislative rather than merely an adjudicative fact. *Id.* An opposite view, we noted, would lead to the possibility that identical conduct might be protected by the United States Constitution in one jurisdiction and yet be illegal in another, depending on whether the respective trial courts credited one line of sociological thinking or another. As in *Dunagin,* we do not suggest that in matters of general information the court's pick of one expert opinion over another should ordinarily be determinative of the underlying issue.

business necessity of [the] college requirement."

■ We conclude that the district court's findings in this regard are not clearly erroneous. As one expert testified, a police officer in Dallas is equipped with a gun at least from the point that the officer leaves the police academy, and sometimes before, and is immediately confronted with the possibility of having to handle crisis situations. The extraordinary risk posed by an officer who is *not* adequate for the job is such that the City is justified in requiring applicants for positions on the police force to possess "the professional maturity gained through education." As the *Hodgson* Court stated, it "is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice." 499 F.2d at 863. Moreover, accepting the

district court's finding that the City's requirement is roughly equivalent to a high school diploma requirement in the past, the district court's finding of job relatedness, based as it is on studies such as the President's Commission and on expert testimony, is consistent with the solid line of authority sustaining the job relatedness of educational requirements for the position of police officer under similar proof.[16] Compliance with the EEOC guidelines does not present an obstacle in light of the studies introduced and expert testimony.[17]

## II. Marihuana Usage

■ We likewise sustain the district court's finding that the requirement that applicants not have "recent or excessive marijuana usage" as determined by the Department's Marijuana Usage Chart is job related.[18] Under Texas law, knowing

**16.** *See* note 6, *supra.* We note the following exchange at oral argument:

"[The Court:] Would any educational requirement meet your standard?
"[Attorney for Appellants:] Oh, yes.
"[The Court:] What would they—
"[Attorney for Appellants:] High school. That's because the case law shows that it has been validated by professionally acceptable methods, and the courts are in agreement that a high school education is a valid requirement for a police officer."

**17.** The Supreme Court in *Griggs* said that validation must be shown "by professionally acceptable methods." 95 S.Ct. at 2378. Section 1607.-4(c), 29 C.F.R., states that "[e]vidence of a test's validity should consist of *empirical data* demonstrating that the test is predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." (Emphasis added.) Section 1607.2 defines "test" to include "specific educational or work history requirements," and "personal history or background requirements," such as are at issue in this case. Under section 1607.5(a), the guidelines state that "empirical evidence in support of a test's validity must be *based on* studies employing generally accepted procedures for determining criterion-related validity." (Emphasis added.) Here, the district court noted that expert witnesses *relied on* studies in reaching their conclusions.

Moreover, section 1607.7 provides:
"In cases where the validity of a test cannot be determined pursuant to § 1607.4 and § 1607.5 (e.g., ... an appropriate criterion

measure cannot be developed), evidence from validity studies conducted in other organizations, such as that reported in test manuals and professional literature, may be considered acceptable when: (a) The studies pertain to jobs which are comparable (i.e., have basically the same task elements), and (b) there are no major differences in contextual variables or sample composition which are likely to significantly affect validity."
In the instant case, the court noted the difficulty of reducing such skills as "maturity" to measurable components, but observed that the experts in this case relied on other studies to support their testimony.

**18.** The issue respecting marihuana was stated in the pretrial order as being "[w]hether the following requirements of the Dallas Police Department are sufficiently job-related to be valid selection standards: 1. [College hours]. 2. [Driving record past year]. 3. [Driving record past two years]. 4. That the applicant will be disqualified for marijuana use under circumstances determined by the marijuana usage chart."

The criteria in question states: "15. Must not have recent or excessive marijuana usage as determined by the Marijuana Usage Chart:", following which the chart is set out.

Under the Marijuana Usage Chart, disqualification is determined by the number of separate occasions on which the applicant has used marihuana within varying specified lengths of time (three months, six months, one year, eighteen months, two years, three years, and five years) immediately preceding the application. More occasions are permissible if over greater lengths

or intentional possession of "a usable quantity of marihuana" is an offense punishable by imprisonment.[19]

The City offered the testimony of Alan Brown, an Associate Professor of Psychology at Southern Methodist University and a licensed psychologist. Brown examined the City's requirement from three perspectives: (1) the propensity for an officer to use marihuana in the future if he has used it in the past; (2) his willingness to enforce the law concerning marihuana if he used it in the past; (3) the credibility of the officer in the eyes of the public once the information becomes known. Brown testified:

> "In my professional opinion, an officer who has used marijuana in the past is less likely to enforce that law than an individual who has not used—who has never used marijuana in the past."

Brown based his conclusion on the basis of the concept of cognitive dissonance, which he explained as a disparity between an individual's cognition (his beliefs on a matter) and his actual behavior; the individual, uncomfortable with the conflict between cognition and behavior, attempts to reconcile the disparity. Brown related the concept to the law enforcement situation:

> "Presumably, a police officer who has smoked marijuana in the past, and who is now a police officer, has several different choices to bring the—their prior behavior in line with their present attitude of a

law enforcer. They can—they can either assume that they are really a criminal deep down inside, or really a law breaker, and that would bring the two in line. But that seems unlikely to me, that they would devalue themselves. What they would probably do is trivialize either their law—either the law or their own behavior at that point.

"For instance, they might—they might think that the marijuana law is not really that important a law or that fair a law; therefore, them breaking a rather trivial law is not that great a violation....

"... [W]hen confronted with a situation where there is an individual violating the marijuana law, they are in a position of being less likely to enforce that law. It's not meaning that they will not enforce that, it means that, from my opinion, they will be less prone, on the average, to enforce it, simply because if they trivialize their behavior, then they can't go down hard on the other individual who is also engaged in that trivial behavior."

Brown also testified that "the individual who has smoked marijuana in the past is more likely to smoke it in the future, simply on this behavioral principal [*sic*] of consistency of behavior." Brown indicated that it would be impossible to quantify either propensity to be less inclined to en-

---

of time prior to the application. Any usage within the preceding three months is disqualifying, but as many as thirty-five separate occasions of usage within the preceding two years are not necessarily disqualifying. Some other examples are as follows: as many as five occasions within the preceding six months are not disqualifying if none are within the three months before the application; use on six different occasions within the preceding six months disqualifies, but use on as many as ten different occasions within the preceding year does not, provided none is within three months and not more than five are within six months of the application; use on as many as twenty different occasions within the preceding eighteen months is not disqualifying, provided none are within three months, not more than five are within six months, and not more than ten are within one year prior to the application. The reasonableness of the chart as such (its particular numbers

for occasions of use and lengths of time prior to application, and their correlation) is not questioned on this appeal.

**19.** *See* Tex.Rev.Civ.Stat.Ann. art. 4476–15, § 4.051(a). If the amount possessed is not more than two ounces, the offense is a Class B misdemeanor carrying a maximum punishment of six months' imprisonment and a $1,000 fine; if the amount is more than two, but not more than four ounces, the offense is a Class A misdemeanor carrying a maximum punishment of one year's imprisonment and a $2,000 fine; if the amount is more than four ounces, the offense is a felony, the permissible punishment varying with the amount, but in all events carrying a minimum term of imprisonment of not less than two years and with the lowest maximum term (where not more than five pounds is possessed) being ten years. *Id.* §§ 4.01, 4.051(b).

force the law or to continue smoking marihuana in the future.

The City also offered the testimony of Redlinger, who testified on the subject of educational standards as well. In addition to his work in the field of police education, Redlinger had published on the subject of the relationship between the police and illicit drugs, and co-authored a "national study of police departments dealing with narcotics control." His testimony included the following:

"Q In your opinion, is a user of marijuana less likely, as a police officer, to enforce the marijuana laws?

"A I would make that inference, yes, sir.

"Q All right, sir. And what leads you to make that inference?

"A Well, several things. One, as part of the study we did of narcotics departments nationally we ran onto a particular department in which the policy was not to enforce the marijuana laws by the officers, some of whom had previously used marijuana.

"On the other hand, I would again say that the rich literature with regard to the indentification with a deviant subculture, or some subculture, would indicate that people who have used marijuana would be more sympathetic to marijuana users, and—so that if an officer was involved in using marijuana, or had used it recently in the past, he or she would be more sympathetic to those people, and less likely, therefore, to equitably enforce that law.

"Q All right, sir. I take it that your opinion in this respect is based in part on your study of relevant literature within the field of sociology; is that right?

"A Yes. It's based upon a review of relevant literature, as well as personal research that I have done in the area of drugs."

The district court concluded that the City "established job relatedness in the necessity of this criteria" and that the testimony of the "experts establish[es] the job relatedness of marijuana usage as a disqualification factor." We hold that the district court's findings are not clearly erroneous. Particularly in light of the responsibility and discretion inherent in the position of police officer, as well as the compelling interest in enforcing existent criminal laws, we are unwilling to require the City in this respect to "lower ... [its] pre-employment standards for such a job." *Spurlock,* 475 F.2d at 219; *see also Kinsey,* 557 F.2d at 837 (public interest justifies "high employment standards").

### III. Hazardous Driving Convictions

Similarly, we affirm the district court's finding that the City's remaining challenged job requirement, involving hazardous driving convictions, is job related. Cecily Ann Hine, a consulting actuary for Independent Actuarial Services, gave expert testimony that evidence of moving traffic violations is a "reliable predictor" of future accident involvement and "the best available means of screening drivers with high accident potential." When asked what "empirical evidence" she had to support her opinion, Hine testified that she examined six different studies which considered prediction of accident involvement. She testified:

"[I]n all but one, prior conviction records, prior accident records were considered predictors of future accident involvement. The one where it wasn't significant was an extremely small study, and lacked what we called statistical power. And in the remaining five, all but one found convictions to be one of the *best* predictor variables." (Emphasis added.)

Redlinger likewise testified that there is a relationship between the hazardous traffic requirement of the City and an officer's ability to be an effective police officer. Redlinger added that "a person who is habitually an offender of the traffic laws is more likely to offend them in the future. Also, more likely to be a person that engages in hazardous driving other than when they get caught; and that, given the significant amount of time the majority— the vast majority of officers spend in their

automobiles, that this would be of serious concern to any police department. Both for the safety of the officers, the safety of the citizens, as well as the cost to the organization."

Hine's and Redlinger's testimony was supported by studies which the City introduced into evidence. A study by the California Department of Insurance, Rate Regulation Division, entitled "Study of California Driving Performance (Phase II)," stated that there was a "definite trend toward increased accident involvement as a function of a driver's prior conviction and prior accident frequency," and that "the poor record drivers have many more accidents than do drivers who are free of convictions or accidents." In fact, the study concluded that "[p]rior traffic citation frequency appears to be a significantly better predictor of future accident involvement than prior accident history." Similar correlations were found in a Department of Transportation study entitled "The Psychometric Prediction of Negligent Driver Recidivism" and a University of North Carolina Highway Safety Research Center study entitled "The Statistical Association Between Past and Future Accidents and Violations."

The district court, in reliance on this evidence, found that the defendants had "again shown the job relatedness factor of th[ese] criteria." The court noted that the "ability to drive safely is an essential part of [an officer's] … duties. All new recruits are assigned to a patrol car for six months of field training. Subsequent to such training, the recruit is then assigned to a patrol division for at least two years."[20] The court concluded that "the lives and property at risk each time a Dallas police officer operates a squad car necessitates the city's rejecting of applicants who, based upon past driving records, are likely to have accidents." The district

court's finding is not clearly erroneous. If anything, the requirement that an officer not have three or more hazardous, or moving, violation convictions in the past year nor six such in the past two years seems an obvious necessity in a job which so heavily involves the performance of driving duties. The decisions of other courts which have addressed the public interest in having safe drivers, considered under our discussion of "Public Risk and Responsibility," reinforces our conclusion.

### Conclusion

For the foregoing reasons, we affirm the decision of the district court's finding that each of the challenged job requirements of the City of Dallas are job related within the meaning of *Griggs.*

**AFFIRMED.**

---

**20.** The court also found, with ample evidentiary support, as follows: "[T]he patrol officer must be able to drive an automobile and would be totally useless without such ability. Approximately 50% of the department is assigned to the patrol division with even a greater percentage having the operation of a vehicle as a part of

their job. Patrol officers spend four to five hours a day or more behind the wheel. Only about 15 or 20% of the patrols are two-man squads. In addition, in times of emergency, even officers who are currently assigned to desk jobs may have to go into the field."